David Bilsker (Bar No. 152383)
davidbilsker@quinnemanuel.com
David A. Perlson (Bar No. 209502)
davidperlson@quinnemanuel.com
Andrew Naravage (Bar No. 320586)
andrewnaravage@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA  94111
(415) 875-6600 Tel.
(415) 875-6700 Fax

Ethan Glass (Bar No. 216159)
ethanglass@quinnemanuel.com
Mike Bonanno (*pro hac vice* forthcoming)
mikebonanno@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, D.C.  20005
(202) 538-8000 Tel.
(202) 538-8100 Fax

Anne S. Toker (*pro hac vice* forthcoming)
annetoker@quinnemanuel.com
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York  10010
(212) 849-7000 Tel.
(212) 849-7100 Fax

Attorneys for Plaintiffs Complete Genomics, Inc., BGI Americas Corp., and MGI Americas, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| COMPLETE GENOMICS, INC., BGI AMERICAS CORP., and MGI AMERICAS, INC. <br><br> Plaintiffs, <br><br> vs. <br><br> ILLUMINA, INC., ILLUMINA CAMBRIDGE LTD., <br><br> Defendants. | Case No. 21-cv-00217 <br><br> **COMPLAINT FOR VIOLATION OF FEDERAL ANTITRUST AND CALIFORNIA UNFAIR COMPETITION LAWS** <br><br> **DEMAND FOR JURY TRIAL** |

**NATURE OF THE ACTION**

1.      Fraudulent behavior in obtaining and enforcing patents is unlawful.  Plaintiffs bring this action to redress such unlawful behavior by Illumina.  Illumina has asserted at least three patents in the Northern District of California against Plaintiffs in an unlawful, anticompetitive manner. Illumina obtained two of the patents through fraud on the Patent Office by concealing, among other things, a reference (Ex. 1, Teréz Kovács & László Ötvös, *Simple Synthesis of 5-Vinyl- and 5-Ethynyl-2'Deoxyuridine-5'-Triphosphates*, 29 Tetrahedron Letters 4525 (1988) [hereinafter *Kovács*]) that its scientists copied and plagiarized, which clearly teaches why one of skill in the art would want to convert 3′-O blocked nucleosides into nucleotides, and taught how to do it.  On the third patent, there is no reasonably objective or subjective basis by which Illumina could assert that Plaintiffs' CoolMPS product infringes the claims of that patent.

2.      With respect to Illumina's fraud on the United States Patent Office, had the examiner been aware of the Kovács reference, he never would have allowed claim 3 of U.S. Patent No. 7,541,444 (Ex. 36, "the '444 patent"), the only '444 patent claim asserted against CoolMPS.  The only difference between claim 3 and the prior art Zavgorodny 1991 reference (Ex. 2, Sergey Zavgorodny *et al.*, *1-Alkylthioalkylation of Nucleoside Hydroxyl Functions & Its Synthetic Applications:  A New Versatile Method in Nucleoside Chemistry*, 32 Tetrahedron Letters 7593 (1991) [hereinafter *Zavgorodny 1991*]), which Illumina also copied, plagiarized, and concealed from the Patent Office, but which the examiner found on his own, and/or the Zavgorodny 2000 reference (Ex. 3, S.G. Zavgorodny *et al.*, S,X-*Acetals in Nucleoside Chemistry. III[1].Synthesis of 2′ & 3′-O-Azidomethyl Derivatives of Ribonucleosides*, 19 Nucleosides, Nucleotides & Nucleic Acids 1977 (2000) [hereinafter *Zavgorodny 2000*]) that Illumina also copied and plagiarized, but disclosed after the Examiner found the Zavgorodny 1991 article, (collectively, "Zavgorodny references") was extremely minor.  The Zavgorodny references disclosed a nucleoside with a 3′-O azidomethyl block and Illumina consequently narrowed the '444 claims, which originally covered both nucleotides and nucleosides with 3′-O azidomethyl blocks, to only claim, a 3′-O azidomethyl blocked nucleotide.  When Kovács is combined with the Zavgorodny references, it provides the motivation and method for converting Zavgorodny's 3′-O azidomethyl blocked nucleoside into a 3′-O azidomethyl blocked nucleotide by

adding three phosphates.  For many of the same reasons, asserted claim 13 of United States Patent No. 7,771,973 (Ex. 37, "the '973 patent"), the only '973 patent claim asserted against Plaintiffs' CoolMPS product is tainted with the same fraud.  The '973 patent  shares the same specification as the '444 patent, is a divisional of the '444 patent, and is directed to the use of a 3′-O azidomethyl nucleotide. Like the prosecution of the '444 patent, Illumina concealed the Kovács reference during prosecution of the '973 patent.  Thus, the '973 patent was also obtained through Illumina's knowing concealment and fraud on the United States Patent Office.  Illumina's actions in fraudulently obtaining and asserting the '444 and '973 patents against Plaintiffs, coupled with its market power, is a *Walker Process*-type antitrust violation.

3.      Illumina has also asserted that Plaintiffs' novel CoolMPS sequencing technology infringes United States Patent No. 10,480,025 (Ex. 38, "the '025 patent").  But, even Illumina admits that there is no literal infringement of the two independent claims in this patent, 1 and 9, it asserted against CoolMPS.  Instead, Illumina alleges that Plaintiffs' novel CoolMPS sequencing technology infringes claims 1 and 9 and their dependent claims  under the doctrine of equivalents.  Illumina alleges that CoolMPS's use of an antibody with a fluorescent molecule, which attaches at both the sugar and base of what had been a nucleotide after it is incorporated into and becomes part of a polynucleotide chain, is the equivalent of the claimed nucleotide with a detectable label attached to the base of a nucleotide via a cleavable linker.

4.      Besides the fact that it is objectively apparent to one of ordinary skill in the art that CoolMPS's antibody with a fluorescent molecule and the claimed detectable label attached to the base of a nucleotide via a cleavable linker are substantially different, clear and unequivocal statements Illumina made in the specification of the '025 patent dictate that the CoolMPS antibody comprising  a fluorescent molecule, which is attached to both the sugar and base of what had been a nucleotide, after it is incorporated into and becomes part of a  polynucleotide chain, cannot infringe claims 1 and 9 of the '025 patent.  As such, Illumina's assertion of the '025 patent against Plaintiffs is objectively and subjectively baseless, is sham litigation, and constitutes a *PRE/Handgards*-type antitrust violation.

5.      Through this fraud and baseless patent litigation, Illumina obtained a preliminary injunction, which harmed Plaintiffs and consumers by preventing Plaintiffs from even introducing

1  competition (CoolMPS) into the U.S. market.  Despite the invalidity of the '444 and '973 patents in

2  light of the concealed Kovács reference and others, and non-infringement of the '025 patent, Illumina

3  continues to press its lawsuits against CoolMPS.  Illumina's actions have harmed not only Plaintiffs,

4  but the consuming public, who has been forced to pay higher, monopolistic prices for sequencing

5  systems and reagents.  Illumina's actions constitute violations of Section 2 of the Sherman Act and

6  California Business and Professions Code § 17200.

7  **THE PARTIES AND ILLUMINA'S HISTORY OF ANTICOMPETITIVE ACTIONS**

8       6.      "Illumina is a monopolist."  That is how the Federal Trade Commission recently

9  described Illumina in a Complaint against Illumina to prevent it from extinguishing yet another

10  potential competitor (there, Pacific Biosciences of California, Inc.) in the Next Generation Sequencing

11  Market ("NGS Market").  Ex. 4 (Complaint, *In re Illumina, Inc., & Pacific Biosciences of California,*

12  *Inc. (PacBio)*, Docket No. 9387 (F.T.C. Dec. 17, 2019) [hereinafter *FTC Administrative Complaint*],

13  https://www.ftc.gov/system/files/documents/cases/d9387_illumina_pacbio_administrative_part_3_co

14  mplaint_public.pdf) ¶ 1.

15      7.      The Federal Trade Commission continued, describing Illumina as follows:  "It is the

16  self-proclaimed leader in DNA sequencing and dominates DNA sequencing markets in the United

17  States and worldwide.  Its name is often considered synonymous with 'next-generation sequencing'

18  ('NGS'), the technology that allows researchers and clinicians quickly, accurately, and efficiently to

19  identify the order of the component blocks—called nucleotides—in a DNA sample.  In the United

20  States, Illumina has complete dominance over the market for these products, with a share of over 90%.

21  Historically, Illumina has faced little competition for its NGS instruments and consumables

22  (collectively, 'systems')."  Ex. 4 (FTC Administrative Complaint) ¶ 1.

23      8.      Based in San Jose, California, Complete Genomics, Inc. ("Complete Genomics" or

24  "CGI") was formed in 2006 and grew out of the efforts of the husband and wife scientific team of Drs.

25  Radoje and Snezana Drmanac.  By February 2009, CGI had sequenced its first human genome using

26  its own novel technology and submitted its findings to the National Center for Biotechnology

27  Information Database.  By November 2009, CGI had sequenced three human genomes and published

28  the data and methodology in the prestigious journal *Science*.  *See.* Ex. 5 (Radoje Drmanac *et al.*,

*Human Genome Sequencing Using Unchained Base Reads on Self-Assembling DNA Nanoarrays*, 327 Science 78 (2010)).  By the end of the same year, CGI had sequenced 50 human genomes.

9.    Sensing that CGI would be a competitive threat, Illumina, which had recently acquired its sequencing technology by way of purchasing Solexa in 2007, embarked on the first of its anticompetitive strategies against CGI by filing two separate patent infringement lawsuits.  In the first suit, filed on August 3, 2010 in the District of Delaware and subsequently transferred to the Northern District of California in November 2010, Illumina claimed CGI infringed United States Patent Nos. 6,306,597 ("the '597 patent"), 7,232,656 ("the '656 patent"), and 7,598,035 ("the '035 patent").  *See* Complaint, *Illumina, Inc. v. Complete Genomics, Inc.*, No. 3:10-cv-05542-EDL (N.D. Cal. Aug. 3, 2010), ECF No. 1.  While the first action was pending, Illumina filed a second action on June 15, 2012 in the Southern District of California alleging that CGI infringed U.S. Patent No. 8,192,930.  *See* Complaint, *Illumina, Inc. v. Complete Genomics, Inc.*, No. 3:12-cv-01465-BEN-BGS (S.D. Cal. June 15, 2012), ECF No. 1.  In the same time frame, Illumina also explored purchasing CGI.  In May 2011, Illumina entered into an agreement with CGI whereby CGI provided "Evaluation Material" to Illumina on a confidential basis for Illumina to use only for the purpose of evaluating CGI's technology and financial status.  Around that same time, in 2011, Illumina purchased Epicenter Biotechnologies, a company that supplied reagents useful in the sequencing field.

10.    But, CGI did not bow to Illumina's pressure to abandon the sequencing market.  Eventually, Illumina's claims were found to be meritless.  First, in the Northern District of California, the charges of infringement for the '656 and '035 patents were dismissed on May 5, 2011.  *See* Stipulation & Order Dismissing Claims Regarding U.S. Patent Nos. 7,232,656 & 7,598,035, *Illumina, Inc. v. Complete Genomics, Inc.*, No. 3:10-cv-05542-EDL (N.D. Cal. May 5, 2011), ECF No. 75.  Then, on March 26, 2012, the Court invalidated asserted claims 9, 10, and 14-19 of the '597 patent on summary judgement—Illumina having stipulated in prior litigation with another competitor that independent claim 1 was invalid.  *See Illumina Inc. v. Complete Genomics Inc.*, No. 3:10-cv-05542-EDL, 2013 WL 1282977, at *2, *4 (N.D. Cal. Mar. 26, 2013).  The following day, the same Court ruled on summary judgement that claims 2, 4 and 5 of the '597 patent were not infringed.  *See Illumina Inc. v. Complete Genomics Inc.*, No. C-10-05542 EDL, 2013 WL 1644829 (N.D. Cal. Mar.

1    27, 2013).  These rulings prompted Illumina to dismiss both actions against CGI with prejudice.  *See*

2    Ex. 6 (*Illumina, Inc. v. Complete Genomics, Inc.*, No. 3:10-cv-05542-EDL (N.D. Cal. July 19, 2013),

3    ECF No. 256); Ex. 7 (*Illumina, Inc. v. Complete Genomics, Inc.*, No. 3:12-cv-01465-BEN-BGS (S.D.

4    Cal. July 23, 2013), ECF No. 54).

5            11.    In the same month that the Court in the Northern District was finding claims of the

6    '597 patent invalid and not infringed, the BGI Group ("BGI") consummated its transaction to

7    purchase CGI that had begun in 2012.  The transaction was not an easy one.  As reported in the New

8    York Times, Illumina made a competing public bid for CGI after learning of BGI's bid.  *See* Ex. 8

9    (Andrew Pollack, *U.S. Clears DNA Firm's Acquisition by Chinese*, N.Y. Times (Dec. 30, 2012),

10   https://nyti.ms/Uganuv).   When Illumina determined that CGI preferred BGI's offer, including

11   because CGI did not believe an acquisition by Illumina would ever clear antitrust review, the New

12   York Times reported that Illumina attempted to derail the BGI-CGI deal.  *Id.*

13           12.    The Times reported that Illumina hired a Washington lobbyist to stir up opposition to

14   the deal in Congress.  Illumina  raised concerns about national security, claiming that BGI would have

15   access to a large database of U.S. genetic information that could allow it to develop drugs and

16   diagnostic tests.  *Id.*  But, contradictorily, Illumina had never raised such concerns when it was selling

17   large numbers of sequencers to BGI for use in sequencing samples that originated in the U.S.  *Id.*

18           13.    Without evidence, Illumina characterized BGI as part of the Chinese government, and

19   its CEO, Jay T. Flatley, claimed that the Chinese government would fund BGI and allow it to move its

20   technology forward at a pace that Illumina could not match.  *Id.*

21           14.    Others companies who were trying to enter the next generation sequencing field

22   dismissed Illumina's claims as baseless.  For example, Michael W. Hunkapiller, the chief executive of

23   Pacific Biosciences, who Illumina recently attempted to acquire, said:  "I can't believe they can come

24   up with a rational explanation of why this is a national security issue."  *Id.*

25           15.    Eventually, despite Illumina's attempts to derail the deal, BGI's acquisition of CGI did

26   go through.  But, that is not to say that BGI was a newcomer to the sequencing field before then.  BGI

27   was formed in 1999 to participate in the Human Genome Project.  It became a significant early source

28   of sequence information and was responsible for many important sequencing breakthroughs,

including, to name just a few:  decoding and publishing the rice genome in the journal Science in 2002; decoding the SARS virus in 2003 and providing a diagnostic kit for detecting it; sequencing and publishing the sequence of the giant panda in the journal Nature in 2009; and sequencing, in three days, the E. coli bacteria responsible for the deadly German E. coli outbreak of 2011 and releasing those results to researchers.

16.    With its acquisition of CGI in 2013—which became the research arm of the BGI Group—BGI was able to leverage new sequencing technology to advance science at an even greater rate.  Prior to the acquisition, Complete Genomics had developed and sought patents on numerous DNA sequencing breakthroughs that have become major advances in the sequencing field.  For example, in 2008 it developed and filed for a patent on a method for using just two colors and a dark state to sequence four nucleotides in Sequencing by Synthesis.  *See, e.g.*, U.S. Patent Nos. 9,222,132 and 10,662,473.  This methodology has become generically known as two-color sequencing.

17.    Complete Genomics also developed and sought patents on high density patterned arrays used in sequencing by synthesis.  These high density arrays, on which DNAs to be sequenced are affixed, allow much more data to be obtained in a sequencing run than was previously possible. *See, e.g.*, U.S. Patent No. 9,944,984.  Complete Genomics also developed nanoball technology ("DNBs"), which allows multiple copies of a sequencing template to be created by a linear amplification process.  The BGI group of companies has used these technological breakthroughs to advance its mission to provide researchers and clinicians with the core technologies to understand, prevent, diagnose, and treat diseases such as cancer and viral and bacterial infections using genomic information in the most economical fashion possible.

18.    In particular, while both Illumina and Complete Genomics offer sequencing solutions in the NGS Market, their approaches are quite different.  Illumina's technology is based on sequencing-by-synthesis reactions that rely on a form of the Polymerase Chain Reaction ("PCR"), called Bridge or Exclusion Amplification.  PCR can introduce nucleotide copying errors with each cycle and as more cycles are completed, more and more copying errors are introduced.  The copying errors with PCR create errors in the sequencing data.  Moreover, Illumina utilizes nucleotides that have fluorescent molecules attached to the base of a nucleotide with a cleavable linker before they are

incorporated into and become part of a polynucleotide chain.  After each cycle of incorporation, the fluorescent molecule is chemically cleaved, leaving a "scar" on the nucleotide.  The scar can negatively affect the ability of additional nucleotides to be incorporated and become part of the polynucleotide chain.

19.     CGI, on the other hand, uses a nanoball technique that is based on rolling circle replication ("RCR").  RCR, unlike PCR, is an isothermal replication process that introduces fewer errors than PCR.  As a result, it gives more accurate sequencing results than sequencing-by-synthesis methods, such as Illumina's, that are based on PCR.

20.     Another significant difference between the Illumina methodology and the methodology Complete Genomics uses for its NGS approach is the way the most recently incorporated nucleotide that has become part of the polynucleotide chain is detected.  Unlike Illumina's technology, Complete Genomics' novel CoolMPS technology does not incorporate labeled nucleotides.  Nor does it use a cleavable linker to attach a fluorescent molecule to a nucleotide base.  Rather, in CoolMPS, unlabeled nucleotides become a part of a polynucleotide chain.  Then, an antibody with a fluorescent molecule attaches to both a specific base and the 3′ position on the sugar.  The CoolMPS antibodies are not removed by any type of chemical cleavage, as with Illumina's cleavable linker.  And, there is no scar left in CoolMPS, when an antibody comprising a fluorescent molecule is washed away.

21.     Overall, CGI's technology represents promising advantages to what currently exists in the market.  In this regard, two titans in the field of biotechnology, Drs. Leroy Hood and George Church, agreed to sit on its scientific advisory board.  Dr. Hood developed, among many other things, what has been credited as the first automated DNA sequencer.  He has been awarded numerous prizes and is one of only 15 scientists in history to be named a member of the National Academy of Sciences, The National Academy of Engineering, and the National Academy of Medicine.  *See* Ex. 9 (Press Release, National Ethnic Coalition of Organizations, NECO Presents The 30th Annual Ellis Island Medals of Honor (May 9, 2016), https://isbscience.org/news/2016/05/09/dr-lee-hood-receives-ellis-island-medal-honor.  In 2015, Scientific American named him one of the ten most influential people in the field of biotechnology.  *See* Ex. 10 (*The WorldView 100*, Scientific American WorldView (2015), https://static.scientificamerican.com/wv/assets/2015_SAWorldView.pdf).  That

same honor went to George Church, who like Dr. Hood, has been responsible for too many breakthroughs in biotechnology, including sequencing methodologies, to catalogue here in a few pages. *See id.*

22.     Despite the fundamental differences between the Illumina technology and CGI's CoolMPS methodology, Illumina has instituted a worldwide litigation campaign against CGI and its related companies based on the use of a single chemical, azidomethyl, that Illumina was not the first to make or use as a 3′-O block on a nucleoside.  Rather, at least ten years before Illumina first disclosed the use of that chemical, a group led by Zavgorodny published a paper describing the synthesis of azidomethyl and its use as a 3′-O blocking group on a nucleoside. Ex. 2 (Zavgorodny 1991).

23.     As explained in more detail later in this complaint, Illumina copied the synthesis methodology that Zavgorodny first published in 1991 and then expanded on in 2000. Exs. 2, 3.  But in the patents it has asserted against BGI, and in other related patents that it has asserted against other competitors, Illumina and the named inventors detailed the synthesis methodology for azidomethyl as if they had created it, completely failing to attribute any part of the methodology to Zavgorodny's work.

24.     Such a practice would certainly constitute academic fraud had Illumina followed the same tactic in publishing work alleging that it was the first to use azidomethyl as a 3′-O nucleoside blocking group in a peer reviewed journal.

25.     But Illumina's deceptive acts are not limited to that one event.  The Illumina inventors and other scientists who worked on making Illumina's 3′-O azidomethyl blocked nucleotides also copied the methodology for converting the 3′ blocked azidomethyl nucleoside Zavgorodny had created, into a nucleotide by adding three phosphates.  The methodology for adding the phosphates Illumina  copied was published by Kovács in 1988 and a citation to that work appears in the notebook of one of the Illumina scientists performing the work.  *See* Ex. 11 (excerpt from Dr. Sarah Lee's lab notebook).  Again, the inventors described the conversion of the nucleoside to a nucleotide in the asserted patents as if it was something they had created, giving no attribution to Kovács's work. Illumina's concealment of the Kovács work from the Patent Office is particularly troubling because not only does it disclose the methodology Illumina used to convert the Zavgorodny 3′-O azidomethyl

blocked nucleoside to a nucleotide, but it also details why someone would want to do that.  Had the Patent Office had the Kovács reference in hand, it could not and would not have allowed the '444 patent claim that Illumina has asserted against CoolMPS.

26.     But that is not the end of Illumina's deception with respect to the asserted patents. Illumina also represents in the '444 and '973 patents that it had discovered a novel methodology to remove the 3′-O azidomethyl block from the nucleotide.  What Illumina failed to mention in its patents is that the methodology had been discovered in 1919 and used extensively since by many scientists working in the field.  That methodology is known as the Staudinger reaction for reducing azides to amines (hemiaminals) with phosphines.  Zavgorodny specifically pointed to benefits of using the Staudinger reaction to remove the 3′-O azidomethyl block from the nucleoside.

## JURISDICTION

27.     This Court has jurisdiction over the federal claims alleged under 15 U.S.C. § 4, 28 U.S.C. § 1331, and 28 U.S.C. § 1337(a).  This Court has jurisdiction over the unfair competition claims arising under state law pursuant to 28 U.S.C. § 1367(a) because Complete Genomics' state law claims arise out of the same factual nucleus as its federal law claims.

## VENUE

28.     Complete Genomics, Inc. is a privately held research company incorporated under the laws of Delaware with its principal place of business at 2904 Orchard Way, San Jose, California 95134.

29.     BGI Americas Corp. is a Delaware Corporation with its principal place of business at 2904 Orchard Way, San Jose, California 95134.

30.     MGI Americas, Inc. is a Delaware Corporation with its principal place of business at 2904 Orchard Way, San Jose, California 95134

31.     Hereinafter, CGI, MGI Americas, Inc., and BGI Americas, Inc. will be referred to collectively as "CGI" or "Complete Genomics."

32.     Defendant Illumina, Inc. is a Delaware corporation with its principal place of business at 5200 Illumina Way, San Diego, California 92122.  Illumina has a regular and established place of business in this District at 25861 Industrial Blvd, Hayward, CA 94545.

33.     Defendant Illumina Cambridge Ltd. is a foreign corporation with its principle place of business at Chesterford Research Park, Little Chesterford, Saffron Walden, Essex CB10 1XL, United Kingdom.

34.     Defendant Illumina Cambridge Ltd. is a wholly-owned subsidiary of Illumina, Inc., and claims to be the owner by assignment of all right, title and interest in and to the '973, '444, and '025 patents.

35.     Illumina, Inc. claims to be the exclusive licensee of the '973, '444, and '025 patents with the right to bring suit on those patents.

36.     Illumina, Inc. and Illumina Cambridge Ltd. (collectively, "Illumina") joined as co-plaintiffs in the suit alleging that CGI's CoolMPS infringed the '973, '444, and '025 patents.

37.     Illumina committed the anticompetitive acts described in this Complaint within this District by bringing suit in this district asserting that that Plaintiffs' CoolMPS product infringes the '973, '444, and '025 patents.  *See Illumina, Inc. v. BGI Genomics Co., Ltd.*, Case No. 3:20-cv-01465 (N.D. Cal.).  Accordingly, venue is appropriate in the Northern District of California pursuant to 28 U.S.C. § 1391, 28 U.S.C. § 1404(a), and 15 U.S.C. § 22.

## INTERSTATE COMMERCE

38.     Illumina is engaged in, and its activities substantially affect, interstate trade and commerce. According to Illumina's 2020 Annual Report, its revenues in the United States were "$1,859 million, $1,779 million, and $1,511 million in 2019, 2018, and 2017, respectively." Ex. 12 (Illumina's Form 10-K) at 59.

## THE FEDERAL TRADE COMMISSION'S INVESTIGATION OF ILLUMINA

39.     On November 1, 2018, Illumina agreed to acquire one of its few competitors, Pacific Biosciences of California, Inc. ("PacBio"), for approximately $1.2 billion.  The price per share represented a 71% premium to PacBio's share price as of market close on October 31, 2018.  Ex. 13 (*Illumina to Acquire Pacific Biosciences for Approximately $1.2 Billion, Broadening Access to Long-Read Sequencing and Accelerating Scientific Discovery*, businesswire.com (Nov. 1, 2018), https://www.businesswire.com/news/home/20181101006099/en/Illumina-Acquire-Pacific-Biosciences-Approximately-1.2-Billion).

40.     The Illumina-PacBio transaction was subject to the Hart-Scott-Rodino Act.  That meant Illumina and PacBio had to notify the Federal Trade Commission and the Department of Justice before consummating the proposed acquisition.

41.     Because the Federal Trade Commission determined that further inquiry was necessary, it requested additional information or documentary materials from the parties (a "second request"). Ex.14 (Dan Mogin, *Billion-Dollar Merger of DNA Sequencing Firms Opposed by U.K., Questioned in U.S.*, Nat'l L. Rev. (Nov. 5, 2019), https://www.natlawreview.com/article/billion-dollar-merger-dna-sequencing-firms-opposed-uk-questioned-us).  While Complete Genomics does not have access to the second request, the Federal Trade Commission's model second request has 29 requests for information, not counting subparts, that includes requests for detailed information on "each Relevant Product manufactured or sold [] by the Company in the Relevant Area, and for each," "the name, address, estimated Sales, and estimated market share of the Company and each of the Company's competitors in each Relevant Area in the manufacture or sale of the Relevant Product," "the Sales, market share, or competitive position of the Company or any of its competitors," and "the name and address of each Person that has entered or attempted to enter into, or exited from, the manufacture or sale of each Relevant Product."  Ex. 15 (FTC Premerger Notification Office, *Model Request for Additional Information and Documentary Material (Second Request)* (Apr. 2019) at 4-6, 9, https://www.ftc.gov/system/files/attachments/merger-review/april2019_model_second_request_final.pdf).

42.     On December 19, 2019, the Federal Trade Commission voted 5-0 that it had "reason to believe" that the law has been or is being violated, and that a proceeding is in the public interest, authorizing an administrative action to block Illumina's proposed acquisition of PacBio.   In announcing that action, the Commission press release said, "Illumina is seeking to unlawfully maintain its monopoly in the U.S. market for next-generation DNA sequencing (NGS) systems by extinguishing PacBio as a nascent competitive threat."  Ex.16 (Press Release, Fed. Trade Comm'n, *FTC Challenges Illumina's Proposed Acquisition of PacBio* (Dec. 19, 2019), https://www.ftc.gov/news-events/press-releases/2019/12/ftc-challenges-illuminas-proposed-acquisition-pacbio).

43.     With respect to Illumina's proposed acquisition, the FTC's Bureau of Competition Deputy Director Gail Levine said: "When a monopolist buys a potential rival, it can harm

competition . . .   These deals help monopolists maintain power.  That's why we're challenging this acquisition." *Id.*

44.     On January 2, 2020, Illumina and PacBio abandoned their transaction.  In response, Ms. Levine stated, "This deal threatened to let a monopolist extinguish nascent competition in a growing health care market: next-generation DNA sequencing." Ex. 17 (Press Release, Fed. Trade Comm'n, *Statement of Gail Levine, Deputy Director of FTC Bureau of Competition, Regarding the Announcement that Illumina Inc. has Abandoned Its Proposed Acquisition of Pacific Biosciences of California* (Jan. 2, 2020), https://www.ftc.gov/news-events/press-releases/2020/01/statement-gail-levine-deputy-director-ftc-bureau-competition).

## RELEVANT PRODUCT MARKET

45.     A relevant product market is no broader than NGS systems.

46.     NGS systems are used to determine the order of nucleotides in DNA molecules from a biological sample.  The NGS systems, which are sometimes also referred to as second-generation sequencing systems, have a much higher sequencing throughput than first generation systems. Despite there being a number of different methodologies in NGS, they all share several common advantages over first generation sequencing, like Sanger Sequencing, such as the elimination of gel electrophoresis and the reduction of complex patterns of extension reactions.  The type of NGS system that Illumina offers and that Illumina has prevented Complete Genomics from offering in the United States are NGS systems based on the use of cyclic reversible terminators ("CRT").  Given that Illumina is the dominant player in the NGS market, this type of sequencing has come to be known as sequencing-by-synthesis ("SBS").

47.     The major advance offered by NGS, in general, is the ability to produce an enormous volume of data, in some cases in excess of one billion reads per instrument per run.  Even if such volumes could have been produced with first generation sequencing methods, the time and cost would not have been practical for large scale everyday use.  The increase in throughput of NGS is mainly attributed to performing and detecting sequencing reactions in a highly parallel manner on a solid support (e.g., an array), which eliminates the need for gel electrophoresis used in first generation sequencing like Sanger sequencing.

48.     Scientists use DNA sequencing to ascertain the sequence of individual genes, larger genetic regions, full chromosomes, or the entire genome of any organism.  DNA sequencing is foundational to research spanning the fields of molecular biology, evolutionary biology, genomics, medicine, pharmacology, ecology, and epidemiology.  Other uses for DNA sequencing include clinical medical diagnostics, forensics, biometrics, and consumer genetics.  Additionally, scientists can use DNA sequencing systems to obtain the sequence of RNA transcripts by converting those transcripts to cDNA. Transcriptome information can be especially useful in determine the functions carried out by a cell and it has unique scientific utility for research and clinical use.

49.     With respect to the market in which Illumina and CGI compete, when the FTC initiated administrative proceedings to enjoin the Illumina-PacBio transaction, it alleged the relevant product market was "no broader than all next-generation systems."  Ex. 4 (FTC Administrative Complaint) ¶ 23.   That is because a hypothetical profit-maximizing firm, not subject to price regulation, which was the only present and future seller of NGS systems, likely would impose at least a small but significant and non-transitory increase in the price of NGS systems.  According to the FTC, Illumina's internal documents "routinely recognize the existence of an NGS market" and "refer to competition across NGS systems."  Ex. 4 (FTC Administrative Complaint) ¶ 25.

50.     There are no reasonable substitutes for NGS systems.  As Illumina concedes, Sanger sequencing systems and qPCR detection systems are not reasonable substitutes for next-generation sequencing systems.

51.     As Illumina's website explains, "[t]he critical difference between Sanger sequencing and NGS is sequencing volume.  While the Sanger method only sequences a single DNA fragment at a time, NGS is massively parallel, sequencing millions of fragments simultaneously per run.  This high-throughput process translates into sequencing hundreds to thousands of genes at one time.  NGS also offers greater discovery power to detect novel or rare variants with deep sequencing."  Ex. 18 (*Key Differences Between Next-Generation Sequencing and Sanger Sequencing*, https://www. illumina.com/science/technology/next-generation-sequencing/ngs-vs-sanger-sequencing.html  (last visited Jan. 3, 2021)).  According to the FTC, Sanger sequencing systems "are properly excluded from the NGS Market."  Ex. 4 (FTC Administrative Complaint) ¶ 29.

52. And, as also explained on Illumina's website, "qPCR can only detect known sequences. In contrast, NGS is a hypothesis-free approach that does not require prior knowledge of sequence information. NGS provides higher discovery power to detect novel genes and higher sensitivity to quantify rare variants and transcripts. NGS compared to qPCR technologies also differ in scalability and throughput. While qPCR is effective for low target numbers, the workflow can be cumbersome for multiple targets. NGS is preferable for studies with many targets or samples. A single NGS experiment can identify variants across thousands of target regions with single-base resolution." Ex. 19 (*Advantages of Next-Generation Sequencing vs. qPCR*, https://www.illumina.com/science/technology/next-generation-sequencing/ngs-vs-qpcr.html (last visited Jan. 3, 2021)).

53. Thus, according to Illumina's 2020 Annual Report, "Next-generation sequencing (NGS) technologies are being adopted due to their ability to cost-effectively sequence large sample sizes quickly and accurately, generating vast amounts of high-quality data. . . . The introduction of next-generation sequencing technologies, including ours, has reduced the cost of sequencing by a factor of more than 10,000 and reduced the sequencing time per Gb by a factor of approximately 12,000 over the last 20 years." Ex. 12 (Illumina's Form 10-K) at 5, 12.

## **RELEVANT GEOGRAPHIC MARKET**

54. A relevant geographic market for NGS systems is no broader than the United States.

55. A hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future seller of next-generation sequencing systems located in the United States would impose at least a small but significant and non-transitory increase in price.

56. As the Federal Trade Commission found,

U.S. NGS customers cannot practically turn to suppliers that do not have a U.S. presence to purchase an NGS system. NGS customers require local service and support networks. . . . Intellectual property is a significant barrier to entry in the [U.S.] NGS Market. . . . Using intellectual property, incumbent U.S. NGS suppliers (namely, Illumina) exclude other firms from selling NGS products in the United States, including some companies that supply NGS products elsewhere in the world. . . . One firm, Beijing Genomics Institute ("BGI"), currently provides sequencing instruments outside of the United States, but it is deterred from participating in the U.S. NGS Market due to Illumina's claims that BGI's instruments infringe Illumina's patents.

Ex. 4 (FTC Administrative Complaint) ¶¶ 32-33, 49.

1

**MARKET POWER**

2          57.      According to Illumina's "At a Glance" marketing materials, it is "the global leader in

3    sequencing     and     array-based     technologies."     Ex.     20     (*Illumina    At    a    Glance*,

4    https://www.illumina.com/content/dam/illumina-marketing/images/systems/miniseq/takeover/

5    illumina-web-graphic-at-a-glance.pdf (last visited Jan. 3, 2021)).  As the Federal Trade Commission

6    determined, "Illumina is a monopolist.  It is the self-proclaimed leader in DNA sequencing and

7    dominates DNA sequencing markets in the United States and worldwide. Its name is often considered

8    synonymous with 'next-generation sequencing'. . . .  In the United States, Illumina has complete

9    dominance over the market for these products. . . .  Historically, Illumina has faced little competition

10   for its NGS instruments and consumables. . . .  Illumina has possessed since at least 2009, and

11   continues to possess today, monopoly power in the markets in which it sells its DNA sequencing

12   systems, including in the NGS Market."  Ex. 4 (FTC Administrative Complaint) ¶¶ 1, 36.

13         58.      Illumina's market power is shown by its share of the NGS market and high barriers to

14   entry into that market.  According to the Federal Trade Commission, "Illumina, which has held its

15   dominant position for years, currently maintains a share of more than 90% of the U.S. NGS Market,"

16   *id.* ¶ 51, and has had a share of over 80% of the market since at least 2013, *id*. ¶ 41.  In court filings,

17   Illumina itself has admitted that it "is a recognized industry leader in DNA sequencing, and its

18   technology is used to generate over 90% of the world's sequencing data."  Ex. 21 (Illumina Mot. for

19   Preliminary Injunction at 3, *Illumina, Inc. v. BGI Genomics Co., Ltd.*, Case No. 3:19-CV-03770 (Feb.

20   19. 2020), ECF No. 85).

21         59.      And barriers to entry are high because a new entrant into the NGS market would need

22   to overcome significant scientific, legal, and commercial barriers.  As the Federal Trade Commission

23   described, "DNA sequencing systems are highly complex systems comprising advanced chemistry,

24   sensitive optics, and powerful semiconductors.  Integrating these components into a system that

25   delivers value and performance sufficient to compete with existing systems, is scalable, and is cost

26   effective to manufacture and operate is an immense challenge that requires considerable investment of

27   capital and time."  Ex. 4 (FTC Administrative Complaint) ¶ 53.

28

60.     The Federal Trade Commission found that "Illumina's patent enforcement efforts have prevented, and likely will continue to prevent, new competitors from emerging in the United States." Ex. 4 (FTC Administrative Complaint) ¶ 54.

61.     Illumina also benefits from switching costs.  For end users wishing to use an Illumina sequencing system, dedicated reagents and flow cells from Illumina are required, and most of Illumina's sequencing consumables (59% of the company's sales in 2019) are dedicated.

62.     Thus, as the Federal Trade Commission found, "[s]ince 2013, only one new firm, Oxford Nanopore, has entered and remained in the U.S. NGS Market." Ex. 4 (FTC Administrative Complaint) ¶ 42.  Like BGI, it faced litigation from Illumina.  In February 2016, Illumina filed a complaint with the International Trade Commission to block importation of Oxford's sequencing products.  *See* Complaint, *Certain Nanopores & Prods. Containing Same*, Inv. No. 337-TA-991 (Feb. 23, 2016).  It also brought a companion case in the Southern District of California.  Complaint, *Illumina, Inc. v. Oxford Nanopore Techs. Ltd.*, Case No. 3:15-cv-0477-DMS-MDD (S.D. Cal. Feb. 23, 2016), ECF No. 1.

63.     The only other competitor is PacBio, which according to the Federal Trade Commission, has about 2-3% market share. Ex. 4 (FTC Administrative Complaint) ¶ 46.  One other firm that attempted to enter the market, QIAGEN, faced a series of legal challenges from Illumina.  After introducing a sequencing system and reagents in 2016, it was forced to abandon the U.S. and worldwide sequencing market because of a series of legal challenges that Illumina initiated.  *See, e.g.*, *Illumina, Inc. v. Qiagen, N.V.*, 207 F. Supp. 3d 1081, 1083 (N.D. Cal. 2016) (granting preliminary injunction).  Illumina asserted patents against QIAGEN that are related to the ones asserted here against Complete Genomics in that they too recited as their novelty, a 3′-O azidomethyl blocked nucleotide.  After QIAGEN's exit from the sequencing market, it entered into a sequencing collaboration agreement with Illumina.  *See* Ex. 22 (Reuters Staff, *Qiagen CEO Quits Amid Genetic Sequencing U-Turn, Shares Tumble* (Oct. 8, 2019), https://www.reuters.com/article/us-qiagen-restructuring/qiagen-ceo-quits-amid-genetic-sequencing-u-turn-shares-tumble-idUSKBN1WN11Q).

64.     Moreover, Illumina's market power is shown by its ability to control price.  For example, the Federal Trade Commission found that "[c]ustomers recognize that they have few

1   commercially reasonable alternatives and lack bargaining leverage to obtain lower prices or better

2   contract terms from Illumina.  When Illumina has implemented price increases, those increases have

3   been profitable and have not driven sales toward other DNA sequencing systems. . . .  Illumina is so

4   dominant that it sees limited sales left to compete for."  Ex. 4 (FTC Administrative Complaint) ¶ 38,

5   40.

6               **COMPLETE GENOMICS' CHALLENGE TO ILLUMINA'S MONOPOLY**

7         65.    Complete Genomics and Illumina are direct competitors in the NGS market.  As

8   Illumina admits in court filings, "Illumina directly competes against the Defendants for sales of

9   sequencers, consumables, and services based on Illumina's patented technology. . . .  For example,

10  MGI has marketed its DNBSEQ-G400 in direct competition with Illumina's sequencers."  Ex. 21

11  (Illumina Mot. for Preliminary Injunction at 17, *Illumina, Inc. v. BGI Genomics Co., Ltd.*, Case No.

12  3:19-CV-03770 (Feb. 19. 2020), ECF No. 85).

13        66.    Complete Genomics' competition with Illumina had the potential to benefit consumers

14  with lower prices, higher quality, and greater choice.  For example, Illumina alleged in court filings,

15  "MGI attempts to position its imitative products as comparable to Illumina's sequencers in

16  performance, while undercutting Illumina on price. . . .  Illumina has already lost sales to the

17  Defendants in markets outside the U.S. due to their price undercutting."  *Id.* at 9, 17.  Illumina further

18  claimed that Complete Genomics competition "would also likely cause price erosion," as it has

19  outside of the United States:  "Even if the Defendants' penetration into the U.S. market were limited

20  to a small number of key opinion leaders 'on a no-cost basis,' Defendants' mere presence in the

21  market would likely cause price erosion. . . .  Current and prospective customers often use

22  Defendants' presence and cut-rate pricing to negotiate and attempt to extract price concessions from

23  Illumina. . . .  If MGI supplies sequencers to key opinion leaders 'on a no-cost trial basis,' Illumina

24  would likely have to offer substantial discounts or be faced with a loss of business and damage to its

25  longstanding customer relationships. . . .  And once one customer receives a discount, then other

26  customers will expect the same."  *Id.* at 18.

27        67.    This competition would not only benefit consumers, it would benefit Complete

28  Genomics.  Illumina has admitted in court filings that this competition from Complete Genomics

1    would likely cause Illumina to lose sales, business opportunities, and market share.  *Id.*  "Further,

2    because sequencing customers tend to show significant loyalty to their initial supplier and are

3    reluctant to change sequencing instruments once they become accustomed to them, it would be more

4    difficult for Illumina to sell products to new or existing customers once Defendants" won them with

5    lower prices, such as "a no-cost trial basis."  *Id.*

6    **ILLUMINA'S DECEPTIVE AND FRAUDULENT ACTS IN OBTAINING THE '444 AND
     '973 PATENTS**

7    **I.    Illumina's Copying of Zavgorodny's Methodology To Create A 3′-O Blocked Nucleic
            Acid**

8

9           68.    Each patent applicant owes a duty of candor to the United States Patent Office when

10   seeking a patent.  That duty is embodied in 37 C.F.R. § 1.56 and its language is contained in an oath

11   that each inventor applicant signs.  While there have been various incantations of Rule 56 over the

12   years, Illumina's and its inventors' (hereinafter collectively "Illumina") conduct in obtaining the '444

13   and '973 patents rises to the level of inequitable conduct and fraud before the patent office under any

14   standard.

15          69.    Illumina created a false narrative and followed an affirmative egregious pattern of

16   misconduct that appears to have been deliberately planned and carefully executed to deceive the

17   Patent Office into believing, among other things, that it had identified and synthesized, on its own,

18   azidomethyl as a 3′-O block on a nucleotide or nucleoside.  The logical conclusion is that Illumina

19   embarked upon this course of conduct because it knew that if it had properly assigned attribution to

20   those who had taught making 3′-O blocks on nucleosides and converting nucleosides into nucleotides,

21   it would not have been able to obtain claim 3 of the '444 patent and claim 13 of the '973 patent.

22          70.    When one compares the method of synthesis for a 3′-O azidomethyl block on a

23   nucleoside that Illumina  detailed in the specification of the '444 and '973 patents, and compares it to

24   the synthesis of the 3′-O azidomethyl blocked nucleoside that Zavgorodny taught in his 1991 and 2000

25   publications, one of ordinary skill in the art would conclude that Illumina copied and used the

26   Zavgorodny publications as a blueprint to make the 3′-O azidomethyl blocked nucleoside.  While

27

28

Illumina claims that a 3′-O azidomethyl block is the foundation of the '444 and '973 patents,[1] and they describe the steps in its synthesis in detail in the '444 and '973 specifications, not once is there even the slightest indication in those specifications that Illumina copied or even relied on the work of anyone else.

71.     Below are the steps that Illumina claims to have conceived  in making the 3′-O azidomethyl block, compared to the methodology laid out by Zavgorodny.  Illumina's method for synthesizing a 3′-O azidomethyl block on a nucleoside involves the following steps:  (1) synthesis of a particular intermediate, a 3′-O methylthiomethyl ("3′-O MTM") intermediate; and (2) the synthesis of the 3′-O azidomethyl block from this intermediate.

72.     Zavgorodny 1991 and Zavgorodny 2000, not Illumina, invented this synthesis.  Yet, Illumina discloses in the '444 and '973 patents, making a 3′-O azidomethyl block from a 3′-O-MTM intermediate, and also the method to make the 3′-O MTM intermediate, as if it was its own rather than disclosing that it copied both these steps and the synthesis from Zavgorodny.

73.     The figures below show the making of the 3′-O MTM intermediate.  The left side shows the method Zavgorodny invented in 1991, and the right side shows the method disclosed in the '444 and '973 Patents.  The 3′-O MTM group is highlighted in green.  To make this intermediate, Illumina copies Zavgorodny's  conversion of the 3′-OH group, highlighted in yellow below, to a 3′-O MTM group, by using the reagents acetic acid, acetic anhydride, and DMSO (dimethylsulfoxide).  *See* '444 patent col. 22:50-23:5.

---

[1]  *See, e.g.*, Illumina's Reply in Support of Motions for Preliminary Injunction, *Illumina, Inc. v. BGI Genomics Co., Ltd.*, Case No. 3:20-cv-01465 (N.D. Cal. Feb. 27, 2020), ECF No. 76, at 3 ("**The inventiveness of all five patents is the azidomethyl blocking group** that allows nucleotides to be added to the DNA chain in a controlled, one-by-one way.") (emphasis added); *id.* at 5 ("Illumina's patents indisputably enable **the inventive aspect, which is adding an azido blocking group to a nucleotide.**") (emphasis added); Illumina's Motion for Preliminary Injunction, *Illumina, Inc. v. BGI Genomics Co., Ltd.*, Case No. 3:20-cv-01465 (N.D. Cal. Feb. 27, 2020), ECF No. 11, at 17 ("Each of the asserted claims here contain limitations requiring a modified nucleotide with a cleavable azido blocking group, which is the same limitation that drove the validity findings in Defendants' and Qiagen's failed IPR challenges.").

74.     It is beyond dispute that Zavgorodny in 1991 invented the synthesis of a 3′-O MTM group on a nucleoside using acetic acid, acetic anhydride, and DMSO.  Ex. 2 (Zavgorodny 1991) at 7593; Ex. 23 (Jari Hovinen *et al.*, *Synthesis of 3′-*O*-(ω-Aminoalkoxymethyl)thymidine 5′-Triphosphates, Terminators of DNA Synthesis that Enable 3′ Labelling*, 1999 J. Chem. Soc'y, Perkin Transactions 1, 211).  The addition of acetic acid to this reaction mixture, in particular, is a signature of the Zavgorodny 1991 method.  *See* Ex. 2 (Zavgorodny 1991) at 7593.

75.     Moreover, Zavgorodny 1991 reports the use of a particular volume/volume ratio of acetic acid to acetic anhydride for this reaction:  11:35 or 0.31:1.  Ex. 2 (Zavgorodny 1991) at 7593. Illumina's '444 and '973 patents use the same ratios.  For example, the '444 patent states:  "To a solution of (2) [the 3′-OH nucleoside] (1.84 g, 3.7 mmol) in dry DMSO (7 ml) was added *acetic acid (3.2 ml) and acetic anhydride (10.2 ml)*."  *See* '444 patent col. 22:55-57 (emphasis added).  **The ratio of 3.2 ml acetic acid to 10.2 mil acetic anhydride (3.2/10.2) is exactly the Zavgorodny 1991 ratio of 0.31:1.**[2]  This identity of ratios cannot be a simple coincidence.  It demonstrates that Illumina and its inventors copied and plagiarized Zavgorodny's work.

[2]   I.e. one gets .31/1 when they divide the numerator and denominator by 10.2.

76.     Going to the next step in the synthesis process, just like Zavgorodny, Illumina's '444 and '973 patents disclose the synthesis of the 3′-O azidomethyl blocked nucleoside  from the 3′-O MTM intermediate invented by Zavgorodny 1991.

77.     The figures below show how Illumina copied the synthesis of the 3′-O azidomethyl block from the 3′-O MTM intermediate from Zavgorodny.  The left side of each figure shows the method invented by Zavgorodny 1991 and Zavgorodny 2000, and the right side shows the method Illumina claimed as its own in  the '444 and '973 Patents.  The 3′-O MTM group is highlighted in green and the 3′-O azidomethyl group is highlighted in yellow.  To make the 3′-O azidomethyl block, both the Zavgorodny method, and the one Illumina claims to have created, use the reagents sulfuryl chloride ($SO_2Cl_2$), an azide salt, and DMF (dimethylformamide).  Ex. 2 (Zavgorodny 1991) at 7595; Ex. 3 (Zavgorodny 2000) at 1981; '444 patent col. 23:35-67.

78.    Zavgorodny 1991 and Zavgorodny 2000 invented the synthesis above, making 3′-O azidomethyl from the 3′-O MTM intermediate, in particular using the reagent sulfuryl chloride.

79.    But rather than truthfully stating that it had copied Zavgorodny's synthesis steps, reagents and concentrations in making a 3′-O azidomethyl blocked nucleoside, Illumina passed those off as its own creation in the '444 and '973 patents.

80.    But, this is only the first step in Illumina's carefully crafted, multi-aspect scheme to defraud the United States Patent Office.[3]

## II.    Illumina's Concealment of the Kovács Reference Was Fraud on the Patent Office

### A.    The Materiality to the '444 Claims

81.    During the prosecution of the '444 patent, Illumina had claims (now 1 and 3) directed to a nucleotide or nucleoside modified to include a removable azidomethyl blocking group bound to the 3′- O of the nucleotide or nucleoside.  *See* Ex. 24.  While Illumina had not disclosed Zavgorodny 1991 to the patent office, the examiner found this reference on his own.  Indisputably, Zavgorodny 1991 identifies a removable azidomethyl blocking group bound to the 3′-O of the nucleoside.  *See* Ex. 25 at 3; Ex. 2.  Consequently, the examiner rejected what became claims 1 and 3 over Zavgorodny 1991.  *See* Ex. 26.  Illumina then identified the Zavgorodny 2000 publication to the examiner, which

---

[3]    Illumina perpetrated this same fraudulent scheme on foreign patent offices.

focused and improved on the synthesis methodology for the 3′-O azidomethyl blocked nucleoside first described Zavgorodny's 1991 paper.

82.     As described in detail in the prior section of this complaint it is beyond any dispute that Zavgorodny disclosed a 3′-O azidomethyl blocked nucleoside.

83.     But, Zavgorodny 1991 went further than that.  He singled out azidomethyl as being of special value stating:  "The above compounds are useful specifically [as] blocked synthons. . . . **Azidomethyl group** is of special interest, since it can be removed under very specific and mild conditions, *viz.* with triphenylphosphine in aqueous pryidine at 20° C."  Ex. 2 (Zavgorodny 1991) at 7595 (emphasis added).

84.     To overcome the rejection based on Zavgorodny's disclosure of 3′-O azidomethyl nucleosides, Illumina amended its claims to limit the modified molecule to a nucleotide, narrowing and removing modified nucleosides from the claims it originally sought.  *See* Ex. 26.

85.     Illumina argued to the examiner that a nucleoside with an "s" is different from a nucleotide with a "t."  In particular, after the amendment removing nucleosides from claim 1 and what became claim 3 of the 444 patent, Illumina stated to the Examiner:  "Claim 1 is amended to be directed to a modified <u>nucleotide</u> having the recited features and to incorporate elements of original claim 3.  Zavgorodny et al. do not teach or suggest a compound of instant claim 1.  In light of this distinction, Applicant asserts that Zavgorodny et al. fail to anticipate the claimed nucleotide." *See* Ex. 26 at 7 (underlining by Illumina).

86.     Relying on Illumina's representations, the examiner allowed what are now claims 1 and 3, directed to a modified <u>nucleotide</u> having a removable 3′-O blocking group, "Z," where Z included azidomethyl described by either of two formulas: $C(R')_2\text{-}N(R'')_2$; $C((R')_2\text{-}N_3$, and in which the only difference over the Zavgorodny 1991 or Zavgorodny 2000 references was that Zavgorodny disclosed a 3′-O azidomethyl blocked "nucleoside" rather than a blocked "nucleotide."

87.     Illumina has continued to rely on this distinction as allegedly novel in arguing for maintaining the validity of the '444 claims in light of Zavgorodny alone, or in combination with other references.  For example, Illumina's expert in the preliminary injunction proceedings, Dr. Burgess, stated in his declaration that CGI was not correct in its statement in a published article describing

1   CoolMPS (*see* Ex. 27 (Snezana Drmanac *et al.*, *CoolMPS™:   Advanced Massively Parallel*

2   *Sequencing Using Antibodies Specific to Each Natural Nucleobase*)) that said: the "[azidomethyl]

3   cleavable blocking group was originally synthesized by Zavgorodny in 1991 who highlighted its

4   triggerable cleavage in mild conditions (13)."  Declaration of Kevin Burgess in Support of Illumina's

5   Motion for Preliminary Injunction, *Illumina, Inc. v. BGI Genomics Co., Ltd.*, Case No. 3:20-cv-01465

6   (N.D. Cal. Feb. 27, 2020), ECF No. 13 ¶ 53.

7        88.    According to Dr. Burgess, who appeared to be addressing a different issue: "The

8   molecule described in this [CGI] excerpt and described in Fig. 2 is a nucleotide comprising a base, a

9   deoxyribose ring with a 3′-O-azidomethyl blocking group and a phosphate group, whereas the

10   molecule synthesized by Zavgorodny with the azidomethyl group (the 'Zavgorodny molecule') is not

11   a modified nucleotide."  *Id.* ¶ 53.

12        89.    Illumina's lawyers have made the same argument and taken it a step further.  First, they

13   confirmed that the reason the examiner allowed the '444 claims in light of the Zavgorodny reference

14   was that "[t]he lack of phosphates in Zavgorodny played an important role in the issuance of the '444

15   patent.    During prosecution of the '444 patent, the patent examiner specifically considered

16   Zavgorodny 1991 and determined that Claim 3 was patentable over it (in part) because it did not

17   disclose the claimed 'nucleotide,' given that it does not disclose the required phosphates."  Illumina's

18   Reply in Support of Motions for Preliminary Injunction, *Illumina, Inc. v. BGI Genomics Co., Ltd.*,

19   Case No. 3:20-cv-01465 (N.D. Cal. Apr. 28, 2020), ECF No. 76 at 9.

20        90.    Next, Illumina claimed that it would not be obvious to add phosphates to the 3′-O

21   azidomethyl blocked nucleoside of Zavgorodny (1991 or 2000), because a person of ordinary skill in

22   the art would not be motivated to do so and there was no evidence that the 3′-O azidomethyl blocked

23   nucleoside had been tested as an antiviral.  *Id.* at 13:5-6, 11-15.  This latter argument, with respect to

24   the antiviral, is a non-sequitur.  If there was evidence that the 3′-O azidomethyl blocked nucleoside

25   had been tested as an antiviral, the issue would not be one of obviousness, but rather anticipation.

26   Obviousness, by its very nature, recognizes that something has not been done, but rather, would be

27   obvious to do or try.

28

91.     Next, to support its theory of non-obviousness, Illumina attorneys stated, "Indeed, Zavgorodny 2000 never discloses using azidomethyl groups in an antiviral compound, and instead it affirms that azidomethyl groups are used as protecting groups that are removed to prepare nucleosides." *Id.* at 13:15-17.  But that claim is certainly not consistent with the facts.

92.     First, Zavgorodny 1991 states: "The compounds discussed above are useful specifically [as] blocked synthons."  Ex. 2 at 7595.  There is no reason why one of ordinary skill in the art would not understand that one of the compounds that can be made from the 3′–O azidomethyl blocked nucleoside synthon that Zavgorodny 1991 describes as being of special interest because of the easy removability of the azidomethyl by the Staudinger reaction (*id.*),[4] is a 3′-O azidomethyl blocked nucleotide through the addition of phosphates.

93.     Next, the text of Zavgorodny 2000 makes even clearer that Illumina's statement that this publication does not suggest using the 3′-O azidomethyl as an antiviral and only suggests that it is an intermediate that is removed to prepare nucleosides is flat wrong.  First, Zavgorodny 2000 states: "Modification of methylthiomethyl (MTM) function[2] in O-MTM derivatives of nucleosides enables synthesis of **_potential antivirals_**, oligonucleotide analogues with formacetal internucleoside linkages, nucleosides containing new protective groups . . . ."  Ex. 3 at 1977.

94.     Zavgorodny goes on to explain that one of those MTM derivatives, in fact the primary one he concentrates on, is a 3′-O azidomethyl blocked nucleoside.  "RESULTS AND DISCUSSION - - In the present work we synthesized 2′-O-azidomethyl (scheme 2) and 3′-O-azidomethyl (scheme 3) derivatives of ribonucleosides by cleavage [of] the parent methylthiomethyl derivatives followed by lithium azide treatment."  *Id.* at 1979.

95.     There is simply no logical reason why a person of ordinary skill in the art would exclude the 3′-O azidomethyl derivatives of MTM which Zavgorodny 2000 describes, which comprise the bulk of the Zavgorodny 2000 disclosure, as potential antivirals.  Second, the text of Zavgorodny 2000 also demonstrates the sleight of hand in Illumina's claim that Zavgorodny 2000's "azidomethyl groups are used as protecting groups that are removed to prepare nucleosides."  Illumina's Reply in

---

[4]   The Staudinger reaction, identified in 1919, teaches using phosphines to reduce Azides ($N_3$) to Amines ($NH_2$), just as Zavgorodny teaches.

Support of Motions for Preliminary Injunction, *Illumina, Inc. v. BGI Genomics Co., Ltd.*, Case No. 3:20-cv-01465 (N.D. Cal. Apr. 28, 2020), ECF No. 76 at 13.  What Zavgorodny 2000 says is: "On the one hand, azidomethyl group incorporation can be easily controlled by IR spectrometry.  On the other hand, this group can be removed under specific and mild conditions (triphenylphosphine in aqueous pyridine at ~ 20°C) **or** used to obtain other derivatives or analogues of nucleosides."   Ex. 3 (Zavgorodny 2000) at 1980.  In other words, removing azidomethyl from the nucleoside to create other derivatives or analogues of nucleosides is one alternative, while removing it for other reasons, is another.

96.     With respect to the relevance of Kovács in relation to Zavgorodny 2000's suggestion that the 3′-O azidomethyl blocked nucleotide could be used as an antiviral, for those not of ordinary skill in the art, a brief overview and explanation of how some antivirals work will make the materiality of Kovács to the claims of the '444 and '973 patents more readily apparent.

97.     Many of the first generation antiviral drugs were modified nucleosides.   These nucleosides were modified by having a 3′-O block such that the 3′OH was not available for reaction.  These compounds were known as nucleoside reverse-transcriptase inhibitors.  Once phosphorylated by a cell, they compete with natural nucleotides for incorporation into growing viral DNA chains.  When the modified nucleotides with the 3′-O blocks are incorporated into growing strands in a cell, they act as chain terminators.  Additional nucleotides cannot be added because without the 3′OH of the sugar present, additional nucleotides cannot form the 5′—3′ phosphodiester bond needed to extend the DNA chain.

98.     In other words, antivirals that are nucleoside analog reverse-transcriptase inhibitors ("NARTI") work in essentially the same way as blocking groups on nucleotides used in sequencing by synthesis: when they are incorporated into a DNA chain, because there is a 3′-O block present, further nucleotides cannot be added to a growing nucleotide chain.  Thus, nucleoside analogues that are antivirals that are chain terminators, especially those in which the blocking group can easily be removed, are good candidates for blocking groups in Sequencing by Synthesis.

99.     One such well-known antiviral of this type is AZT.  It was the primary antiviral used against HIV-1 for many years.  Interestingly, the AZT nucleoside analogues used to fight HIV-1 had a

structure very similar to 3′-O azidomethyl blocked nucleoside analogues.  Both have an azido group on the 3′-O of the nucleoside.

100.    Therefore, even if neither Zavgorodny 1991 or 2000 suggested trying a 3′-O azidomethyl blocked nucleoside as an antiviral, which is what Illumina has repeatedly argued, the knowledge of those of ordinary skill in the art coupled with the Kovács reference (Ex. 1) makes it obvious to try an azidomethyl blocked nucleoside as an antiviral, and in so doing, it would invalidate claims 1 and 3 of the '444 patent.

101.    Kovács states:  "In the last decade, numerous pyrimidine nucleoside analogues have proven to be remarkably potent and selective in the activity against herpes simplex virus infections (for recent reviews see ref. 1).  The nucleoside analogues all share the common feature that their biological function requires their intracellular conversion to the corresponding 5′-nucleotides. Investigations of the mechanism by which these nucleoside analogues interfere with the cellular metabolism therefore require the chemical synthesis of phosphorylated derivatives."  Ex. 1 at 4525.

102.    Kovács explains that antivirals work in living systems by having the cell the convert the nucleoside analogue into a nucleotide when the cell itself adds the phosphates.  *Id.*  Importantly, Kovács further explains that to study how a potential antiviral will function in a cell, by conducting experiments on a laboratory bench outside the cell (*i.e.* in vitro), a scientist must himself perform the phosphorylation (adding three phosphates to the nucleoside to turn it into a nucleotide) that is normally done by the cell itself.  Ex. 1 at 4525.  Kovács states:  "Owing to the great importance of phosphorylated biological molecules there are several reviews dealing with methods of their phosphorylation."  *Id.*

103.    Having found some issues with previous methods of phosphorylation, Kovács devises a new scheme to phosphorylate nucleosides which he then describes in his paper.  *Id.* at 4527.

104.    Kovács is not just some random paper that Plaintiffs have located.  As with Illumina's copying of the Zavgorodny 3′-O azidomethyl blocked nucleoside, the specification again shows that Illumina copies the phosphorylation scheme that Kovács created, yet again without any attribution. And this time, the examiner did not find the reference on his own, so it was never before the Patent Office.

105.   As shown below, when one of ordinary skill in the art compares the phosphorylation scheme of the 3′-O azidomethyl blocked nucleoside intermediate that the inventors turn into the claimed 3′-O azidomethyl blocked nucleotide by adding phosphates, with the synthesis method Kovács created for adding phosphates to nucleosides to turn them into nucleotides, the conclusion they come to is that Illumina copied and plagiarized Kovács, and, as with Zavgorodny, claimed Kovács work as its own.  The very fact that the synthesis scheme for adding the phosphates to the nucleoside described in the '444 patent was copied from Kovács demonstrates that Illumina and the inventors knew of Kovács.  Yet, they never disclosed it to the PTO or even in the litigation in which they asserted the patents against CGI.

106.   The following steps show the pervasive nature of the copying.  Kovács's new method for phosphorylation of nucleosides to create nucleotides involved the addition of a reagent known as a "proton sponge."  Ex. 1 at 4527.  The reagents Kovács used, including the proton sponge, are as follows:  proton sponge, POCl₃, bis-tri-n-butylammonium phosphate (pyrophosphate salt), DMF, n-Bu₃N.  *Id.*

107.   The figure below compares the Kovács method for phosphorylation of nucleosides to the method that Illumina describes in the '444 and '973 patents as its own.  The 5′ OH group is highlighted in yellow in the figures, and the triphosphate is highlighted in green in the figures:



108.   The use of the proton sponge is a signature feature of Kovács's method for phosphorylating nucleosides.  Illumina copied Kovács's method to phosphorylate 3′-O azidomethyl

1  blocked nucleosides (that it copied from Zavgorodny) into the '444 and '973 patents.  *See* '444 patent

2  col. 24:55-25:24.

3      109.    In addition, while there are various different pyrophosphate salts available that could be

4  used, Illumina uses exactly the same pyrophosphate salt that Kovács uses—the bis-tri-n-

5  butylammonium salt.  One of ordinary skill in the art would not find those similarities to be mere

6  coincidence.  Rather, they would again consider these facts to be evidence copying and plagiarism.

7      110.    But, one need not only rely on the overwhelming similarity of Kovács method and

8  what Illumina and the inventors disclose in the '444 and '973 patents to demonstrate that Illumina

9  knew of and copied Kovács and concealed  it during the prosecution of the '444 and '973 patents.

10  The notebooks of the inventors and others working closely with them on making the 3′-O azidomethyl

11  blocked nucleotide from the 3′-O azidomethyl blocked nucleoside demonstrates it as well.

12      111.    At least three different Solexa employees were working together on creating 3′ OH

13  blocked nucleotides.  Those three employees—Drs. Xiaohai Liu, Xiaolin Wu, and Sarah Lee—created

14  many of the blocked nucleotides by first creating a blocked nucleoside and then phosphorylating the

15  nucleosides to create a blocked nucleotide.  Two of those three employees, Dr. Liu and Dr. Wu, are

16  named inventors on the '444 and '973 patents.

17      112.    Multiple notebook pages from these three employees shows they were following the

18  same methodology to phosphorylate the 3′ OH blocked nucleosides, turning them into blocked

19  nucleotides.  Examples of that work are the following:  Dr. Liu's work on March 22, 2001 appearing

20  at notebook page ILMNBGI0203655, his work on October 7 2002 appearing on notebook page

21  ILMNBGI0203945; and his work on April 8 2002 appearing on notebook page ILMNBGI0203911;

22  and   Dr.   Wu's   work   on   August   6   and   7,   2002   appearing   on   notebook   page

23  ILMNBGI_NDCAL0003520.[5]

24      113.    Dr. Lee took many of the nucleoside compounds that Dr. Liu and Wu were working on

25  and herself phosphorylated them, thereby converting them to nucleotides.  Examples of this work

26

27  ───────────────

28      [5]  Only the identity of these notebook page numbers are public at this time.

1  were done on March 8 and 14, 2002 and appear in Dr. Lee's notebook at pages ILMNBGI0003478,

2  34790-80.

3     114.   The citation for where the common methodology that Drs. Wu, Liu and Lee were using

4  to phosphorylate nucleosides turning them into nucleotides is shown in a notebook entry from Dr.

5  Lee. In that entry, dated April 23 2001, which appears at the top of Dr. Lee's notebook page,

6  ILMNBGI0207720, shows that Dr. Lee references a publication from the journal Tetrahedron Letters.

7  That entry is copied below.



ILMNBGI0207720

25     115.   More specifically, that entry identifies a reference in Tetrahedron Letters, Vol. 29, pp

26  4525-4528, 1998. While the citation references a date of 1998, the rest of the citation aligns exactly

27  with the citation for the Kovács paper, which was published in 1988. Given the description of the

28  work being done, it is apparent that Dr. Lee was citing to the Kovács paper which is what she and Drs.

1  Wu and Liu were copying.  In fact, Dr. Lee had cited that same Kovács work in a paper she submitted

2  as first named author in November 2000 that was published in 2001.  *See* Ex. 28 (Sarah E. Lee *et al.*,

3  *Enhancing the Catalytic Repertoire of Nucleic Acids:  A Systematic Study of Linker Length & Rigidity*,

4  29 Nucleic Acids Research 1565 (2001) at 1567, 1569 (citing reference 28, Kovács).

5      116.   As the comparison of the method described in the '444 patent with Kovács

6  demonstrated, the work shown in Drs. Liu's, Wu's, and Lee's  notebooks also shows they were

7  copying Kovács when they were converting 3′–O azidomethyl blocked nucleosides to nucleotides by

8  adding phosphates.  The fact that Drs. Lee, Wu, and Liu are all using the same methodology and that it

9  is the same method that Kovács described is again, not mere coincidence.  The citation in Dr. Lee's

10  notebook to Kovács, her prior citation to it in published papers and the fact that the work in the

11  notebooks and in the '444 and '973 patent specifications track Kovács shows that Drs. Liu, Wu, and

12  Lee knew of the Kovács paper.

13      117.   It is not plausible that these three employees, in what was at the time a very small

14  company—who were working closely together, and in fact performing work on compounds each other

15  created, each following the same methodology for phosphorylating nucleosides shown in Kovács—

16  did not all know of the Kovács publication.  The citation in Dr. Lee's notebook on April 23, 2001, the

17  work of Drs. Liu and Wu following the Kovács methodology well before the filing of the '444 patent,

18  and the '444 and '973 patent specifications' copying of the Kovács's synthesis methodology also

19  demonstrates that at least two of the '444 inventors, Drs. Wu and Liu ,were aware of the Kovács paper

20  prior to the filing of the '444 application and were following its teachings.

21      118.   Drs. Wu and Liu's and Illumina's concealment of the Kovács reference indicates a

22  specific intent to deceive the patent office and the examiner into issuing the '444 and  the related '973

23  patent.  Drs. Wu, Liu, and Illumina knew that had the examiner been informed of the motivations to

24  convert nucleotides into nucleotides as described in Kovács, as well as a specific synthesis method for

25  doing so, the Examiner would not have allowed a claim whose only difference from the disclosure in

26  the Zavgorodny reference was that Zavgorodny disclosed azidomethyl blocking the 3′-O of a

27  nucleoside whereas claims 1 and 3 of the '444 patent had been narrowed to just cover azidomethyl

28  blocking the 3′-O of a nucleotide (a nucleoside with phosphates added).  For those reasons, an

examiner certainly would have considered the Kovács reference material to the examination of the '444 patent.

119.     In particular, the Kovács reference was material to the prosecution of the '444 patent because claim 3 of the '444 patent, the only '444 claim that Illumina has asserted against Plaintiffs' CoolMPS, would not have issued but for Illumina's concealment of the Kovács reference.  The '444 claim first requires a modified nucleotide having a base and a sugar having a removable 3′-O blocking group covalently attached.  As described and shown in prior paragraphs, the nucleoside molecule shown in Zavgorodny 1991 and 2000 meets this element except that it is a nucleoside rather than a nucleotide.  When combined with Kovács, this element is met because Kovács provides the motivation to convert the Zavgorodny nucleoside into a nucleotide to test it as a potential antiviral *in vitro*, as Zavgorodny 2000 specifically states is one of the potential uses of the 3′-O azidomethyl blocked nucleoside molecules he is describing in the paper.  *See, e.g.*, Ex. 1 (Kovács) at 4525; Ex. 3 (Zavgorodny 2000) at 1977.  Moreover, as Zavgorodny specifically teaches, the azidomethyl blocking group is "of special interest, since it can be removed under very specific and mild conditions, *viz.* with triphenylphosphine in aqueous pryidine at 20° C," the Staudinger reaction. Ex. 2 (Zavgorodny 1991) at 7595; Ex. 3 (Zavgorodny 2000) at 1980 (same).  This meets the requirement that the 3′-O azidomethyl blocking group of Zavgorodny is removable.

120.     The other limitations of claim 1 and 3 of the '444 patent simply list general formulas which describe various blocking groups, including azidomethyl as:  $C(R')_2 - N(R'')_2$ or $C(R')_2 - N_3$, where $R' = H$ and $R'' = N$.  *See* '444 patent col. 86:1-31.

121.     Last, Zavgorodny also satisfies the last wherein clause that identifies the specific way the blocking group is removed by exchanging the $R''$ for H, where $R''$ is N, to yield an intermediate which then disassociates in aqueous conditions to afford a molecule with a free 3′OH.  This is what occurs with the Staudinger reaction that Zavgorodny details, and the Staudinger reaction is the same mechanism that the '444 claims identify for the removal, again without attribution to the 1919 discovery by Staudinger, or the subsequent work of many others using and publishing their results using the Staudinger reaction.

122.    Even if Zavgorodny did not teach the specific method of removing the azidomethyl blocking group identified in the last wherein clause of claim 1 of the '444 patent, it would not matter. Illumina argued to the Court, and the Court accepted as its claim construction in Case No. 3:20-cv-1465, where Illumina is asserting the '444 patent against Plaintiffs, that the last "wherein" clause does not need to be met when one chooses to identify azidomethyl by the formula: $C(R')_2 - N_3$, since it is impossible for it to be met when one selects that formula for azidomethyl, because there is no $R''$ group in that formula, and the wherein clause refers to $R''$ to describe the reaction.

123.    For all the reasons described previously, Kovács is material prior art to claim 3 of the '444 patent and but for Illumina concealing it  from the patent office, those claims would not have issued had the examiner been able to view Kovács in light of Zavgorodny 1991 and/or 2000.

**B.    The Materiality to the '973 Claims**

124.    The '973 patent is tainted with the same fraud that Illumina committed when it concealed Kovács in prosecuting the '444 patent.  And, for the same reasons already discussed with respect to Kovács' materiality to claim 3 of the '444 patent, Kovács is material to claim 13 of the '973 patent, the only '973 claim that Illumina has asserted against CoolMPS.  Zavgorodny 1991 and/or 2000 in light of Kovács when combined with Parce renders claim 13 of the '973 patent obvious under 35 U.S. C. § 103.  But for Illumina's concealment of Kovács, dependent claim 13 of the '973 patent would not have issued.

125.    Independent claim 1 of the '973 patent begins by claiming the previously known steps in sequencing by synthesis reactions:  "determining the sequence of a target single-stranded polynucleotide, comprising monitoring the sequential incorporation of complementary nucleotides, wherein at least one incorporation is of a nucleotide having a removable 3′-OH blocking group covalently attached thereto, such that the 3′ carbon atom has attached a group of the structure . . . ." '973 patent claim 1 at col. 86:24-31.

126.    That these steps were already known for sequencing by synthesis reactions well prior to the '973 inventors seeking their patent is not subject to any legitimate dispute.  For example, in United States Patent No. 9,410,200 (Ex. 29, "the '200 patent")—also assigned to Illumina and having three of the same inventors as the '973 patent, Colin Barnes, Xiaohai Liu, and John Milton—Illumina, in the

1   background section at col. 1:59-2:3, references United States Patent No. 5,302,509 to Cheeseman.

2   This patent was filed in February 1991 and was a continuation of an abandoned patent filed on August

3   14, 1989.  Ex. 30.

4           127.    Illumina in the '200 patent describes Cheeseman as disclosing the following:  "U.S.

5   Pat. No. 5,302,509 discloses a method to sequence polynucleotides immobilised on a solid support.

6   The method relies on the incorporation of 3'-blocked bases A,G, C and T having a different

7   fluorescent label to the immobilised polynucleotide, in the presence of DNA polymerase,  The

8   polymerase incorporates a base complementary to the target polynucleotide, but is prevented from

9   further addition by the 3'-blocking group.  The label of the incorporated base can then be determined

10  and the blocking group removed by chemical cleavage to allow further polymerisation to occur."

11          128.    Similarly United States Patent No. 7,105,300 to Parce, ("Parce") filed on April 14,

12  2003 as a division of application No. 09/510,205, filed on February 22, 2000 and now U.S. Patent No.

13  6,613,513, which was based on provisional applications filed in February and April of 1999 describes

14  the same steps.  Ex. 31.  In the summary of the invention Parce states:

15          "The present invention provides novel methods of sequencing by synthesis or
            incorporation.  Nucleotides or nucleotide analogs are added to reaction mixtures
16          comprising nucleic acid templates and primers, e.g., DNA or RNA.  The nucleotides
            are incorporated into the primer, resulting in an extended primer.  The sequence is
17          determined as each additional complementary nucleotide is incorporated into the
            primer and the steps are repeated until the entire template sequence or a portion thereof
18          is determined.

19          In one embodiment, the nucleotides or nucleotide analogs, or fraction thereof,
            comprise a 3′-blocking group and a detectable label moiety, which typically comprises
20          a phosphate or carbamate group.  The 3′-blocking groups provide reversible chain
            termination.  When added to a growing nucleic acid chain, these nucleotide analogs
21          result in a non-extendable primer. The 3′-blocking group is typically removed, e.g., by
            a reducing agent and/or a phosphatase, to produce an extendable primer to which
22          further nucleotides  are added, thereby allowing continued sequencing of the nucleic
            acid template.  Removal of the 3′-blocking group is optionally performed before or
23          after detection of the added nucleotide."

24  Ex. 31 (Parce) col. 2:27-48.

25          129.    The next limitation in the '973 method of claim 13 describes the structure of the group

26  attached to the 3′ carbon atom as --O—Z where "Z" has a long list of possible structures

27  including: --C(R′)$_2$ – N$_3$, and  --C(R′)$_2$ –N(R″)$_2$ where R′ can = H and R″ can = N.  '973 patent col.

28

86:31-54.  This is the same description of the blocking group contained in claim 3 of the '444 patent.  *Cf.* '444 patent col. 86:2-30.

130.    Asserted Claim 13 of the '973 limits the claimed group to azidomethyl, which is either of:  --$C(R')_2 – N_3$, and --$C(R')_2 –N(R'')_2$.  *See* '973 patent col. 88:37-38.

131.    The last step in the '973 method calls for: "and wherein the blocking group is removed prior to introduction of the next complementary nucleotide."  *Id.* col. 86:55-56.  Plaintiffs argued in claim construction that "introduction" of the next complementary nucleotide, in contrast to nucleotides that were "incorporated," meant nucleotides that were added to the reaction mixture or brought in contact with the template, many of which would not be incorporated.  *See, e.g.*, '973 patent col. 6:19-25 ("In the methods, all of the nucleotides can be brought into contact with the target simultaneously, i.e., a composition comprising all the different nucleotides is brought into contact with the target, and non-incorporated nucleotides are removed prior to detection and subsequent to removal of the label and the blocking group.").

132.    Such a construction would  have provided strong evidence that  Plaintiffs' CoolMPS did  not infringe claim 13  of the '973 patent because in CoolMPS, the blocking group is not removed prior to the next complementary nucleotide(s) being brought into contact with the template (introduced).   At Illumina's urging, the Court construed the term introduction of the next complementary nucleotide to have the same meaning as incorporation of the next complementary nucleotide.

133.    With either construction, Parce teaches this element as well.  Parce states that when a nucleotide with the 3′-blocking group is added to the growing primer, it produces "a non-extendable primer".  The blocking group is then removed, to produce an extendable primer to which further nucleotides are added to allow continued sequencing of the nucleic acid template: "The 3′-blocking groups provide reversible chain termination.  When added to a growing nucleic acid chain, these nucleotide analogs <u>result in a non-extendable primer</u>.  <u>The 3′-blocking group is typically removed</u>, e.g., by a reducing agent and/or a phosphatase, <u>to produce an extendable primer</u> <u>to which further</u> <u>nucleotides  are added,</u> thereby allowing continued sequencing of the nucleic acid template.  Ex. 31 (Parce) col. 2:39-46 (emphasis added).

134.     Consequently, as with the asserted claims of the '444 patent, the only difference between Parce and what is claimed in '973 claim 13, the only asserted claim of the '973 patent, is the identity of the blocking group, azidomethyl.

135.     While Parce does not specifically point to azidomethyl as a blocking group, he invites one of ordinary skill in the art to look for blocking groups beyond those he states are his preferred embodiments: "Blocking groups are typically chemical moieties that are attached to the nucleic acid or nucleotide in the 3′-position to prevent further binding or reactions at that position.  Preferred blocking groups of the present invention include, but are not limited to, phosphate and carbamate groups, e.g. 3′ phosphates and 3′ carbamates.  For more information on blocking groups, see e.g., Protective Groups in Organic Synthesis, by T. Green, Wiley and Sons, New York (1981)."  Ex. 31 (Parce) col. 12:9-17.

136.     In the subsequent volume of the Green book, now with author Wuts, published in 1999 (Ex. 32), azidomethyl is identified as a blocking group of a tertiary/phenol alcohol.  Although there have been suggestions and holdings to the contrary, one of ordinary skill in the art would not exclude such blocking groups from consideration as a blocking group for sequencing by synthesis and only look to blocking groups identified for primary and secondary alcohols.  In fact, almost half of the blocking groups that Illumina suggested in an earlier filed patent draw from tertiary alcohols.  *See* '025 patent Fig. 3.

137.     In any event, armed with the teachings of Zavgorodny 1991 and/or 2000, along with the teachings of Kovács, which give a motivation and method for converting the 3′-O azidomethyl blocked nucleoside of Zavgorodny to a nucleotide, which is what one would use in a sequencing-by-synthesis reaction, it would be obvious to try the 3′-O azidomethyl blocked nucleotide and one of ordinary skill would expect success in the method claimed in the '973 patent.  In this regard, Illumina has pointed out that the skill level in the field at the time of the '973 invention was high, and those of ordinary skill in the art would know how to screen for polymerases that would capable of incorporating modified nucleotides, even if particular polymerases had not yet been identified for specific blocking groups.  *See* Illumina's Reply in Support of Motions for Preliminary Injunction,

*Illumina, Inc. v. BGI Genomics Co., Ltd.*, Case No. 3:20-cv-01465 (N.D. Cal. Apr. 28, 2020), ECF No. 76 at 7.

138.    In particular, Kovács teaches that the phosphorylation methods he discloses are useful in creating nucleotide triphosphate analogues which sterically block the 3′OH of a nucleotide and when such a nucleotide is incorporated into a growing chain with a polymerase, it prevents further incorporation of additional nucleotides into the chain.  He states, for example, that the incorporation of the nucleotide analogues were studied with Klenow DNA polymerase-catalyzed reactions.  *See* Ex. 1 (Kovács) at 4525 ¶ 2.

139.    Kovács's teachings would motivate one of ordinary skill in the art to try the 3′-O azidomethyl blocked nucleosides that Zavgorodny 1991 and/or 2000 teach in combination with phosphorylation and polymerase incorporation that Kovács teaches, to see if the azidomethyl nucleotide can be incorporated into  a polynucleotide by a polymerase.

140.    Once a person is motivated to try the 3′-O azidomethyl blocked nucleotide as an antiviral by testing appropriate polymerases that would incorporate it, they would also be motivated to look for polymerases that would incorporate the same molecule for use in SBS.

141.    Given the high level of skill in the art, Illumina has claimed it would be readily apparent to one of ordinary skill which polymerases would be appropriate to try for SBS and one of ordinary skill in the art would expect success in finding polymerases that would incorporate nucleotides modified with 3′–O azidomethyl blocks such as those taught by Zavgorodny 1991 and/or 2000 in combination with Kovács.

142.    One need look no further for proof of this notion than Illumina's own repeated arguments to that effect.  With regard to defending the enablement of related patents that did not disclose particular polymerases for incorporating azidomethyl nucleotides into polynucleotide chains, Illumina has repeatedly argued that one of ordinary skill in the art would know how to look for such polymerases. *See, e.g.*, Illumina's Reply in Support of Motions for Preliminary Injunction, *Illumina, Inc. v. BGI Genomics Co., Ltd.*, Case No. 3:20-cv-01465 (N.D. Cal. Apr. 28, 2020), ECF No. 76 at 7.

143.    While Illumina has suggested in the case where it asserted the infringement charges against CoolMPS that one would be steered away from azidomethyl as a potential chain terminating

antiviral or blocking group for SBS because it was known that azides could not be incorporated by polymerases, this argument lacks any scientific basis and is easily disproved.  For example, AZT, which has an azide ($N_3$) on the 3′-O worked as a treatment for HIV-1 for the very reason that Reverse Transcriptase, an RNA-dependent DNA polymerase, did incorporate it into a growing DNA strand.  If it did not, then AZT could not have been effective.

144.    Further evidence that one of skill in the art would have been motivated to explore polymerases to incorporate a 3′-O azidomethyl blocked nucleotide appear in Illumina's own patents. In particular, United States Patent No. 10,480,025 (which has four of the same inventors as the '973 patent) and which stems from an application filed on August 23, 2002, Illumina's claimed priority date for this patent, and a year before the earliest priority date of the '973 patent, Illumina states: "Suitable protecting groups will be apparent to the skilled person, and can be formed from any suitable protecting group disclosed in Green and Wuts, supra.  Some examples of such protecting groups are shown in FIG. 3.  The protecting groups should be removable (or modifiable) to produce a 3′OH group.  The process used to obtain the 3′OH group can be any suitable chemical or enzymic reaction."  '025 patent col. 8:41-47.

145.    With respect to which polymerases to use with modified nucleotides in sequencing by synthesis reactions where nucleotides are added to a primer by a polymerase that are complementary to the target polynucleotide (id. col. 9:25-36), Illumina further states: "Many different polymerase enzymes exist, and it will be evident to the person of ordinary skill which is most appropriate to use." Id. col. 9:39-4 (emphasis added).  Illumina then goes on to say:  "Other conditions necessary for carrying out the polymerase reaction, including temperature, pH, buffer compositions etc., will be apparent to those skilled in the art."  Id. col. 10:30-34.

146.    The '025 follows on with the understanding that one of ordinary skill in the art will have a high level of knowledge and how to operate a system or process which includes incorporating nucleotides with polymerases and removing azidomethyl 3′-O blocks will be readily apparent without any disclosure of how to do so in the '025 patent.

147.    In particular, over and over again in the '025 patent, there are claims directed to a nucleotide with a 3′-O azidomethyl block that can be removed to expose a 3′OH.  See id. claims 8, 11,

16, 36, 44, 52, 60; 31 (same but removal of the azidomethyl block allows addition of a nucleotide to the 3′ oxygen), 34 (same), 39 (same), 42 (same), 47 (same), 50 (same), 55(same), 58(same).

148.    Yet, nowhere in the '025 patent, which claims a priority date of August 23, 2002, is there any teaching of how to remove the 3′-O azidomethyl block from the modified nucleotide.  Nor is there any disclosure of a new, not previously existing polymerase to use to incorporate 3′-O azidomethyl blocked nucleotides after removal.  *Id.* col. 9:41-45 ("Preferred enzymes include DNA polymerase I, the Klenow fragment, DNA polymerase III, T4 or T7 DNA polymerases, Taq polymerase, or vent polymerase.  A polymerase engineered to have specific properties can also be used").  One must therefore assume that this would be readily apparent to one of skill in the art, if Illumina's representations were true and the '025 claims are enabled, which polymerases to use to incorporate a 3′-O azidomethyl blocked nucleotide and methods for removing it.

149.    With respect to removal of the 3′-O azidomethyl blocking group, Illumina's lack of teaching in the '025 patent is consistent with the fact that one of ordinary skill in the art reading Zavgorodny 1991 and/or 2000 combined with Kovács's disclosure would certainly know how to remove the 3′-O azidomethyl blocked nucleotide in an appropriate way:  *e.g.*, using the he Staudinger reaction Zavgorodny teaches (utilizing phosphines to reduce azides ($N_3$)).

150.    One of ordinary skill in the art would know that if they wanted to insure that duplex formation is not disrupted by the phosphine used to remove the 3′-O azidomethyl block, they should use water soluble forms of phosphine.

151.    Indeed, in this regard, Parce teaches the use of phosphines to remove 3′-O blocks from incorporated nucleotides in sequencing by synthesis.  In the case of Parce, he teaches the use of a water soluble phosphine, TCEP.  *See* Ex. 31 (Parce) claim 11 at col. 39:41-44 ("The method of claim 10, wherein removing the blocking group from the extended primer comprises contacting the extended primer with one or more of: diborane, dithiothreitol, glutathione, TCEP, and disulfide reductase.").  As explained by one of the early authors who synthesized TCEP, phosphines are very useful reducing agents in biochemical systems.  *See* Ex. 33 (John A. Burns *et al.*, *Selective Reduction of Disulfides by Tris(2-Carboxyethyl)phosphine*, 56 J. Organic Chemistry 2648 (1991)) at 2648.  But the lack of solubility in water and their odor, has limited the use of some phosphines in biochemistry.  *Id.*  Thus,

Burns was motivated to create a form of phosphine, TCEP, that addressed those problems.  Similarly, chemical companies that sell TCEP, cite to the same benefits of TCEP.  *See* Ex. 34 (*Instructions: TCEP HCl*, Thermo Fisher Scientific https://assets.thermofisher.com/TFS-Assets/LSG/manuals/ MAN0011306_TCEP_HCl_UG.pdf  (last visited Jan. 10, 2021)).   Thus, TCEP, has become a preferred phosphine to use in biochemical reduction reactions.

152.    Given all these facts, one of ordinary skill in the art would be motivated to combine Parce with the azidomethyl 3′-O blocked nucleotide taught by Zavgorodny 1991 and/or 2000 in light of Kovács, and would expect success in doing so.  Thus, Kovács is a material reference to '973 claims 1 and 13, because but for the concealment of Kovács, the combination of Zavgorodny 1991/2000 in light of Kovács with Parce would have prevented '973 claim 13 from issuing.  The arguments that Illumina has used in the past to defeat obviousness combinations involving Zavgorodny have no merit, or even applicability, to the combination of Parce and Zavgorodny.

153.    Illumina has argued in the past that one of ordinary skill in the art would not combine either Zavgorodny reference (1991 or 2000)  with various sequencing-by-synthesis references because those references require any blocking group to be efficiently incorporated and removed.  *See, e.g.*, *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1368 (Fed. Cir. 2016) (affirming PTAB decision that one of ordinary skill would not be motivated to combine Zavgorodny 1991 with WO 91/06678 ("Tsien") or U.S. Patent No. 6,664,079 ("Ju")).  Given the efficiency desire expressed in past SBS references used to show invalidity in proceedings covering different Illumina patents, Illumina argued there would be no motivation for one of ordinary skill in the art to even try to combine Zavgorodny with those references.  Illumina has made the same argument with respect to the '973 patent, which has never been challenged before.  But this argument is not legitimate for the Parce/Zavgorodny/Kovács combination for numerous reasons.

154.    First, of note, the claims of the '973 patent have no efficiency requirement.  And as Illumina has asserted and interpreted asserted claim 13, it only require one round of incorporation of an azidomethyl 3′-O blocked nucleotide, with only one base so blocked.  Once the block is removed from that base, Illumina has argued that the only other requirement to satisfy the claim is to repeat the process once more and incorporate and monitor one more base that does not even need to be blocked

at all.  Illumina's Opening Claim Construction Brief, *Illumina, Inc. v. BGI Genomics Co., Ltd.*, Case No. 3:20-cv-01465 (N.D. Cal. Oct. 23, 2020), ECF No. 184 at 16; Transcript of *Markman* Hearing, *Illumina, Inc. v. BGI Genomics Co., Ltd.*, Case No. 3:20-cv-01465 (N.D. Cal. Dec. 29, 2020), ECF No. 235 at 65:20-24 ("The final nucleotide could have no blocking group, in which case the sequencing reaction would end and that would be less than all, but yet still fall within the claim scope.").

155.    In addition to the very small number of cycles using blocked nucleotides that are need to meet the limitations of '973 claim 13 as Illumina has interpreted it, there are absolutely no efficiency requirements stated in the claims, either directed to how fast incorporation and/or removal of blocked nucleotides must be effected, or the percentage of total events where there must be successful incorporation and removal of a single azidomethyl blocked nucleotide.

156.    Given the minimal requirements of claim 13, Parce suffers from none of the problems in combining it with Zavgorodny that some of the prior SBS references combined with Zavgorodny were alleged to have.  In particular, just like the '973 patent, nowhere does Parce require that a blocked nucleotide used in his process must be "efficient" in its incorporation or removal.  Thus, the arguments that were used previously to assert there would be no motivation to combine an SBS reference with Zavgorodny simply do not exist with the combination of Parce and Zavgorodny.  And the motivation requirement, which effectively required the prior art combinations to perform better than what Illumina claimed in previously asserted patents, does not exist here.

157.    Rather, the prior art combinations against the '973 do not have to perform better than what claim 13 of the '973 requires.  The combination only needs to meet the extremely limited requirement that a single 3′-O azidomethyl nucleotide needs to be incorporated and monitored, then removed, and another nucleotide that is not even blocked needs to be incorporated and monitored. Again, there is no limitation on how long this can take or any other "efficiency" measure.

158.    Therefore, even if one could allege that the 3′-O azidomethyl blocked nucleotide taught by the Zavgorodny references would somehow be inefficient in incorporation into or removal from a nucleotide that has become part of a polynucleotide chain—which it would not be to one of skill in the art armed with the knowledge that Illumina has argued was available to one of ordinary skill in the art

at the time of the invention (*e.g,* the knowledge of how to identify and optimize polymerase and the use of TCEP as taught by Parce as the phosphine in the Staudinger reaction that Zavgorodny teaches to remove the azidomethyl block)—that would not raise a bar to combining the Zavgorodny references, in light of Kovács, with Parce.

159.    In other words, by simply following what Illumina has repeatedly argued before this Court and others was common knowledge in the field—how to easily identify polymerases that would incorporate a 3′-O azidomethyl blocked nucleotide—and by following Parce's teaching to use a water-soluble and non-odorous phosphine in the Staudinger reaction that Zavgorodny taught, one of ordinary skill in the art would have been motivated to try Zavgorodny's 3′-O azidomethyl blocked nucleotide (as taught by Kovács) in the system taught by Parce.  The person of ordinary skill in the art would have expected success in incorporating at least one 3′-O azidomethyl blocked nucleotide, successfully removing it and incorporating another nucleotide that did not even need to be blocked.  This combination, which would have been apparent to an examiner had Illumina not concealed the Kovács reference, would have prevented claim 13 of the '973 from issuing.  In other words, but for Illumina's concealment of the Kovács reference, claim 13 of the '973 patent would not have issued.  It would have been found obvious over Parce in combination with Zavgorodny 1991 and/or 2000 in light of Kovács.

160.    Nonetheless, in an attempt to create an issue where none exists, Illumina argued before the Court at the preliminary injunction hearing in Case No. 3:20-cv-1465 case that Parce did have an efficiency requirement that would prevent it from being combined with Zavgorodny.  Transcript of Hearing on Illumina's Motion for Preliminary Injunction, *Illumina, Inc. v. BGI Genomics Co., Ltd.*, Case No. 3:19-cv-03770 (N.D. Cal. May 13, 2020), ECF No. 161 at 47:2-6 ("And I think the argument that we're getting from BGI is, 'Well, we found Parce, and Parce doesn't tell you that you need to be efficient.'  Well, that makes no sense.  First of all, Parce does mention 99 percent efficiency.  So it's just not true.").  This is a significant distortion of what Parce actually says.

161.    In one Parce embodiment, labeled and unlabeled chain terminating nucleotides are used to increase read length.[6] Parce states: "[T]he eventual read length typically depends on the efficiency with which strands are extended.  For example, a 99% efficiency leads to a 64% reduction in signal after 100 cycles.  One scheme to decrease the effect of incorporation efficiency after a labeled nucleotide is added is to use strand-terminating nucleotides for the labeled nucleotides and mix them at low concentration with non-labeled non-terminating nucleotides, e.g., in a 1 to 1000 ratio." Ex. 31 (Parce) col. 20:3-20.

162.    What this paragraph is describing is not that Parce requires efficient incorporation and removal of blocked nucleotides.  Rather, he is stating that in one embodiment, where there is efficient incorporation, and there have been 100 successful cycles of incorporation, the fluorescent signal generated by the next incorporated nucleotide can decrease.  He then identifies ways to solve this problem.  This passage has nothing to do with Parce requiring there to be efficient incorporation of the blocked nucleotide.  All it is saying is that in one embodiment, where you have 100 cycles of successful incorporation, it can cause problems with the strength of the signal in further cycles, and this can be addressed in other ways.

163.    Illumina also argued in proceedings before the patent office, which it submitted to the Court in the cases it brought against Plaintiffs, that one of skill in the art would never have thought to use TCEP to remove the azidomethyl blocked nucleotide because the Stanton publication (Ex. 35 (WO 02/21098 A2)) shows that it damages DNA.  Again, this is a significant distortion of the facts.

164.    First, such a conclusion is contrary to the disclosure in Parce, which specifically claims using TCEP to remove the 3′-O block from the nucleotide to permit further addition of nucleotides to the growing primer chain in an SBS reaction.  One must assume, by law, that the Parce reference contains an enabling disclosure.

165.    Second, the Stanton reference that Illumina relied on does not teach that TCEP will harm DNA as it exists and is used in SBS.  Stanton proposed using modified nucleotides that had been

---

[6] While Illumina argued  that claims 1 and 3 of the '973 patent cover non labeled blocked nucleotides, which the Court adopted in a "close call" in its claim construction, the '973 specification provides no disclosure of how to perform the claimed method of monitoring incorporation of such nucleotides to the extent covered by the claims.

specifically engineered to include functional group modifications in the sugars to make the 3′ and/or 5′ phosphate ester linkage of that particular nucleotide susceptible to cleavage by TCEP.  Ex. 35 at 81-85.  The modifications that Stanton specifically engineered to make the nucleotides susceptible to TCEP cleavage do not exist in natural nucleotides or the 3′-O blocked nucleotides that result from the Zavgorodny references in light of Kovács.

166.    Thus, the whole reference to Stanton is a complete red herring.  Moreover, the amine intermediate formed when TCEP reduces the azidomethyl is highly unstable and spontaneously hydrolyzes in aqueous conditions to yield the 3′-OH group.  Thus, the amine intermediate does not exist for any significant time to cleave phosphate ester linkages of the DNA, and even if it could, the excess of water would dominate the reaction and still yield the 3′-OH group without any cleavage of the phosphate ester linkages.

167.    Interestingly and glaringly, Illumina never taught anything in its patents that would prevent the parade of horribles that Stanton would supposedly predict when using TCEP in the standard Staudinger reaction that Illumina discloses in the '973 patent.  In fact, Illumina teaches the opposite:  that the amine intermediate "produced advantageously spontaneously dissociate under aqueous conditions back to the natural 3′ hydroxy structure, which permits further incorporation of another nucleotide." '973 patent col. 12:7-10.  In summary, the Kovács reference was material to the prosecution of claim 13 of the '973 patent because, but for its concealment, claim 13 would not have issued.  It would have been obvious in light of Parce combined with the Zavgorodny references in light of Kovács.

## ILLUMINA'S SHAM LITIGATION THROUGH THE ASSERTION OF THE '025 PATENT AGAINST COOLMPS (*PRE/HANDGARDS*)

168.    Illumina has further tried to squelch competition by asserting objectively and subjectively baseless patent infringement claims against Complete Genomics.

169.    Illumina has asserted U.S. Patent No. 10,480,025, titled "Labelled Nucleotides," against Complete Genomics' CoolMPS chemistry.  All the claims in the '025 patent that Illumina has asserted against the Complete Genomics CoolMPS (claims 1-2, 4-5, 7-17) require a nucleotide having a 3′-O end block and a detectable label attached via a cleavable linker to the base of a nucleotide or

nucleoside.  It would be readily apparent to one of ordinary skill in the art that CoolMPS cannot meet this limitation for numerous reasons and Illumina's allegation that it could is neither objectively nor subjectively reasonable.

170.    First, independent claims 1 and 9 of the '025 patent state that the detectable label is attached to the base via a cleavable linker.  Illumina has already admitted that CoolMPS does not contain a cleavable linker.  But it is proceeding under the theory that the CoolMPS antibody comprising a fluorescent molecule can meet this requirement under the doctrine of equivalents.  This position is objectively and subjectively baseless and Illumina knows it.

171.    It is readily apparent to one of ordinary skill in the art reading the claims' requirement of a cleavable linker attaching a detectable label to the base of the nucleotide, along with the description of the invention in the specification, that this means the detectable label and cleavable linker are only attached to the base of the nucleotide and cannot be attached to the sugar.  The Illumina inventors made this clear through an unequivocal statement in the specification distinguishing their method of attaching a detectable label to a nucleotide or nucleoside from the methods that existed in the prior art.

172.    The Illumina inventors stated the following in that regard in the summary of their invention:  "In the present invention, a nucleoside or nucleotide molecule is linked to a detectable label via a cleavable linker group attached to the base, rendering the molecule useful in techniques using Labelled nucleosides or nucleotides, e.g. sequencing reactions, polynucleotide synthesis, nucleic acid amplification, nucleic acid hybridization assays, single nucleotide polymorphism studies, and other techniques using enzymes such as polymerases, reverse transcriptases, terminal trasferases, or other DNA modifying enzymes. . . .  The molecules of the present invention are in contrast to the prior art, where the label is attached to the ribose or deoxyribose sugar, or where the label is attached via a non-cleavable linker"  '025 patent col. 2:22-38 (underlining added).

173.    Despite the '025 inventors clearly and unequivocally stating that their invention does not cover detectable labels attached to the sugar of a nucleotide or nucleoside, they have asserted infringement against the CoolMPS product that does just that.

174.    In the very article describing CoolMPS that Illumina used to create its infringement contentions for the CoolMPS product, which it cited as Ex. 4 to those contentions (*see* Illumina's Infringement Contentions, *Illumina, Inc. v. BGI Genomics Co., Ltd.*, Case No. 3:20-cv-01465 (N.D. Cal. Nov. 23, 2020), ECF Nos. 214-6, 214-7, 214-8), Illumina repeatedly ignored and failed to mention that the CoolMPS antibody with its fluorescent molecule—which Illumina claims satisfies the requirement in claims 1 and 9 of a base linked to a detectable label via a cleavable linker under the doctrine of equivalents—binds to both the base and the sugar of the nucleotide.  *See* Ex. 27.

175.    This is first described on page 2 of the article in three separate places.  First the article states: "Incorporation of unlabeled reversibly terminated nucleotides, and base determination, is performed in each cycle of sequencing using base-specific 3′ block-dependent fluorescently labeled antibodies.  Removal of the bound antibodies and 3′ blocking moiety on the sugar group of the nucleotide regenerates natural nucleotides . . . ."  Ex. 27 at 2 (underlining added).

176.    Next, on the same page, Fig. 1, which Illumina actually reproduced in its infringement contentions, shows an illustration explaining that the antibody binds to both the base and the block, which is  depicted as a "▬" and also referred to as a Reversible Terminator ("RT") on the sugar of the nucleotide.  The portion of the antibody, the left-side of the Y-shaped structure that binds to the horizontal dark blue bar that is the block on the 3′-O part of the nucleotide sugar has the same color (dark blue) as the depicted block.   The part of antibody, the right-side of the Y-shaped structure that binds to the base, has the same color as the base (green). This is then further explained in the caption to Figure 1:



**Figure 1:** CoolMPS™ process overview. Bars ( ▬ ) on the unlabeled ("cold") nucleotides depict removable 3' chemical blocks. Antibodies specific for RTs with natural nucleobase are depicted with three dye molecules to increase fluorescent signal.

177.   A person of skill in the art reading the paper that Illumina relied on for its infringement contentions would know that the antibody must bind to both the sugar and the base, or there would be no way for the antibody to discriminate between the last added nucleotide that has become part of the polynucleotide chain and which has the block on the sugar, and previously added nucleotides of the same type that do not have a block.

178.   But if this and the previous descriptions were not enough to make that clear, the paper goes on to restate the requirement that the antibody bind to the sugar and base, several more times: "Specificity:  Accurate sequence determination requires that the antibodies are specific for the base associated with the <u>3' reversible terminated ribose</u>" (*id.* at 5) (underlining added);  "Fig. 4b: Antibody binding is dependent on both the base <u>and the sugar with the 3'--O-azidomethyl block</u>" (*id.* at 7) (underlining added); "The monoclonal antibodies described in this report no only recognize the natural base type (whether A, C, G or T), but also bind to a <u>small reversible blocking group at the 3' end of the nucleotide</u>," (*id.* at 13) (underlining added).

179.   The CoolMPS antibody that binds to the base and the sugar of what was previously a nucleotide that is then incorporated into a polynucleotide chain, is the antithesis of what the inventors said was required for how the detectable label in the '025 invention had to be attached via a cleavable linker to the nucleotide:  attachment at the base and not the sugar.  The fact that: a) CoolMPS must have the antibody bind to both the base and the sugar of a nucleotide that has been incorporated into and becomes part of a polynucleotide, and b) the inventors said a label and cleavable linker (which

Illumina claims the antibody is equivalent to) cannot be attached to the sugar, is itself sufficient to show that there is not a reasonable objective or subjective good faith basis for Illumina to claim that CoolMPS infringes this element under the doctrine of equivalents.

180.   Illumina cannot avoid the subjective reasonableness element by willfully ignoring what its own inventors said was not the invention (having the cleavable linker attached to the sugar), and willfully disregarding the very evidence it relied on to show infringement, which unequivocally states numerous times that the antibody must bind to both the sugar and the base.  Illumina is well versed in the technology being asserted.  It knows what its inventors have said is not the '025 invention and it has reviewed and relied on the article describing CoolMPS antibodies being attached to the sugar of a nucleotide that has become part of a polynucleotide chain.  Given these facts, Illumina has no subjective or objective good faith basis to assert that CoolMPS meets the cleavable linker/detectable label limitation of claims 1 and 9 of the '025 patent.

181.   Illumina's assertion of claim 9 of the '025 patent is objectively and subjectively baseless for at least one additional reason.  Claim 9 requires a kit that contains "a plurality of nucleotides, each having a ribose or deoxyribose sugar moiety and a base linked to a detectable label via a cleavable linker . . . ." '025 patent col. 21:41-43.  There can be no such kit for CoolMPS.  As explained earlier, even putting aside the fact that the CoolMPS antibody comprising a fluorescent molecule is not the equivalent of a detectable label attached to the base of a nucleotide via a cleavable linker, CoolMPS does not and cannot ever have a kit that has the antibodies attached to a plurality of nucleotides.

182.   Instead, the antibodies used in CoolMPS only attach to a nucleotide that has become part of a polynucleotide chain after many steps in the CoolMPS process are run.  One of skill in the art would find it objectively unreasonable and baseless to first find that the antibody comprising the fluorescent molecule is the equivalent of a detectable label attached only to the base of the nucleotide via a cleavable linker.  To do so would require two unpermitted leaps that ignore reality.

183.   First, it would require suspending the requirement that the detectable label not be attached to the sugar.  Second, it would require suspending the requirement that nucleotides with the detectable label attached only to the base via a cleavable linker actually exist in the kit.  Since the

antibodies used in CoolMPS cannot be attached to any nucleotide or polynucleotide chain until multiple steps in the CoolMPS process are run, they cannot exist in the kit.  Any CoolMPS kit is fundamentally different in that regard from kits Illumina sells which have nucleotides with detectable labels attached to the base of a nucleotide before any reactions are carried out by the user.

184.    Illumina knows, or willfully and knowingly sought to avoid any knowledge regarding, how CoolMPS works and what would be contained in a CoolMPS kit.  As such, Illumina does not, and could not, have a good faith subjective belief that CoolMPS can meet the limitation in claims 1 and 9 and the asserted dependent claims, requiring a nucleotide or nucleoside having a base linked to a detectable label via a cleavable linker, and/or a kit that has such a nucleotide which actually exists.

185.    Further, and independently, it is objectively and subjectively baseless to claim that the CoolMPS antibody comprises a fluorescent molecule.  The function of the antibody is not to act as a group on a nucleotide that can be incorporated into a growing primer oligonucleotide chain by polymerase and which can then release a detectable label after being chemically treated, preferably with the same chemistry that releases the 3′-O blocking group, such that bonds are cut, which is the function of the cleavable linkers attaching detectable labels to the base of a nucleotide that are disclosed in the '025 patent.  The way the cleavable linkers attached to the base of a nucleotide in the '025 patent function is also different from the antibody CoolMPS.  The cleavable linkers that attach the detectable label to the base of a nucleotide in the '025 patent exist before any reaction in a sequencing method is performed.  *See, e.g.*, '025 patent claim 9.  The cleavable linkers of the '025 patent have covalent bonds cut by chemical reactions.  Oppositely, the antibodies comprising fluorescent molecules in CoolMPS do not exist before a sequencing reaction begins.  Further, as described above, they are attached to the sugar of a nucleotide, which is not permitted for the cleavable linkers of the '025 patent.  Additionally, the fluorescent molecules are not released from the antibodies through a chemical reaction that cuts covalent bonds.  Last, the result of cleavage of the cleavable linkers described in the '025 patent is a scar on the nucleotide that hinders the incorporation of further nucleotides into the polynucleotide chain.  On the other hand, when the CoolMPS antibodies comprising fluorescent molecules are removed as a unit from the nucleotide, they do not leave a scar.

186.    In summary, there is no objectively or subjectively reasonable basis for asserting that CoolMPS can infringe the element requiring a base linked to a detectable label via a cleavable linker for the reasons described previously.

187.    Consequently, Illumina's acts in asserting CoolMPS infringes claims 1 and 9 of the '025 patent constitutes sham litigation brought for no other purpose than to assist Illumina in maintain its monopoly power.  Illumina can claim no antitrust immunity of these anticompetitive acts which constitute a violation of Section 2 of the Sherman Act.

188.    Illumina's actions asserting the '444, '973 and '025 patents against CoolMPS have damaged Plaintiffs.  Plaintiffs have been required to expend legal fees to defend against the baseless assertion of infringement of claims 1 and 9 of the '025 patent and by having to defend against the baseless charges of infringement against CoolMPS through Illumina's assertion of the '973 and '444 patents that were obtained by fraud on the patent office.  Illumina's actions have also caused doubt in the consuming public that Plaintiffs will be able to offer a sequencing solution free of Illumina's patent claims. These acts have  caused potential and actual lost sales of CoolMPS in the United States. Plaintiffs seek all damages compensable under the law, including treble damages caused by Illumina's actions, and preliminarily and permanently enjoining Illumina from continuing to assert the '444, '973 and '025 patents against CoolMPS and/or from maintaining a preliminary injunction against the introduction of CoolMPS in the United States.

## NO PROCOMPETITIVE JUSTIFICATIONS

189.    Plaintiffs hereby re-allege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

190.    Illumina's unlawful acts include the bringing of suit based on a patent known to be not infringed by CoolMPS and by seeking and obtaining a preliminary injunction based on patents obtained through fraud on the patent office.

191.    There are no procompetitive justifications for these anticompetitive acts.

## ACTUAL AND ANTITRUST INJURY

192.    Plaintiffs hereby re-allege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

193.    Illumina's anticompetitive acts have harmed competition.  Through objectively baseless patent litigation and assertion and the obtaining of an injunction based on fraudulently obtained patents, Illumina has stopped CGI from selling its CoolMPS product to consumers in the United States.  As a result, consumers have been deprived of the benefits of competition between Illumina and CGI, which, as explained above, Illumina has conceded would force it to lower its own prices.  Thus, Illumina's misconduct has forced consumers to pay higher prices for NGS systems, deprived them of a meaningful competitive alternative, and reduced the quality of NGS system available for them to purchase.

194.    Illumina's anticompetitive acts have also harmed CGI.  The first injury to CGI is litigation costs.  In response to Illumina's anticompetitive infringement suit, Complete Genomics has defended the suit and suffered a very real injury of its own:  the cost of defending the suit.  The litigation costs suffered by Complete Genomics are attributable to what made Illumina's behavior unlawful, *i.e.*, bringing the lawsuit based on a not infringed patent and obtaining a preliminary injunction based on knowingly false statements in pursuit of a monopoly.

195.    CGI's second injury is lost market share and profits.  Illumina's bringing of a lawsuit based on patents obtained through fraud and a patent known to be not infringed and obtaining a preliminary injunction on the fraudulently obtained patents has prevented or deterred customers from purchasing Complete Genomics' CoolMPS products.  Consumers are reluctant to purchase products involved in patent infringement suits because there is a risk that the supplier could be put out of business by the suit making product support unavailable, they do not want to be accused of contributory infringement, and related products (like consumables for CoolMPS products) will be less available because those suppliers do not want to support a product that may not survive or be accused of infringement themselves.  These effects undermine Complete Genomics' competitive position, and cost it profits.  The lost profits suffered by Complete Genomics were attributable to what made Illumina's behavior unlawful, *i.e.*, bringing the lawsuit based on a not infringed patent and obtaining a preliminary injunction based on patents obtained through fraud on the patent office.

Case No. 21-cv-00217
COMPLAINT

196.   Therefore, Complete Genomics' actual injuries flow directly from these unlawful aspects of Illumina's acts and the injury suffered by Complete Genomics qualifies as antitrust injury and thus can form the basis of damages under Section 4 of the Clayton Act (15 U.S.C. § 15).

## CAUSES OF ACTION

### COUNT 1:  MONOPOLIZATION (15 U.S.C. § 2) RELATING TO U.S. PATENT NO. 7,541,444

197.   Plaintiffs hereby re-allege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

198.   Sales of NGS in the United States is a relevant antitrust market.

199.   Illumina has monopoly power in that market.

200.   With respect to the fraudulent procurement of the '444 patent by withholding the Kovács reference, as discussed previously, Illumina has maintained monopoly power by bringing of suit based on a patent known to be not infringed and obtaining a preliminary injunction based on knowingly false statements.

201.   That conduct is harmful to competition.

202.   Illumina's conduct occurred in or affected interstate commerce.

203.   Plaintiffs were harmed in their business or property because of Illumina's conduct.

204.   That harm is the type that the antitrust laws were intended to prevent.

### COUNT 2:  ATTEMPTED MONOPOLIZATION (15 U.S.C. § 2) RELATING TO U.S. PATENT NO. 7,541,444

205.   Plaintiffs hereby re-allege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

206.   Sales of NGS in the United States is a relevant antitrust market.

207.   With respect to the fraudulent procurement of the '444 patent by withholding the Kovács reference, as discussed previously, Illumina has attempted to gain monopoly power by bringing of suit based on a patent known to be not infringed and obtaining a preliminary injunction based on knowingly false statements.

208.   Through this misconduct, there is a dangerous probability that Illumina will successfully monopolize the market for NGS systems in the United States.

209.   That conduct is harmful to competition.

210.   Illumina's conduct occurred in or affected interstate commerce.

211.   Complete Genomics was harmed in its business or property because of Illumina's conduct.

212.   That harm is the type that the antitrust laws were intended to prevent.

**COUNT 3:   UNFAIR COMPETITION (CAL. BUS. & PROF. CODE § 17200) RELATING TO U.S. PATENT NO. 7,541,444**

213.   Plaintiffs hereby re-allege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

214.   With respect to the fraudulent procurement of the '444 patent by withholding the Kovács reference, as discussed previously, Illumina's conduct alleged above to violate Section 2 of the Sherman Act is unlawful.

215.   Illumina's conduct also is unfair because it threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of law, or otherwise significantly threatens or harms competition.

216.   Complete Genomics was harmed in its business or property because of Illumina's conduct.

**COUNT 4:   MONOPOLIZATION (15 U.S.C. § 2) RELATING TO U.S. PATENT NO. 7,771,973**

217.   Plaintiffs hereby re-allege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

218.   Sales of NGS in the United States is a relevant antitrust market.

219.   Illumina has monopoly power in that market.

220.   With respect to the fraudulent procurement of the '973 patent by withholding the Kovács reference, as discussed previously, Illumina has maintained monopoly power by bringing of suit based on a patent known to be not infringed and obtaining a preliminary injunction based on knowingly false statements.

221.   That conduct is harmful to competition.

222.   Illumina's conduct occurred in or affected interstate commerce.

223.    Plaintiffs were harmed in their business or property because of Illumina's conduct.

224.    That harm is the type that the antitrust laws were intended to prevent.

**COUNT 5:  ATTEMPTED MONOPOLIZATION (15 U.S.C. § 2) RELATING TO U.S. PATENT NO. 7,771,973**

225.    Plaintiffs hereby re-allege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

226.    Sales of NGS in the United States is a relevant antitrust market.

227.    With respect to the fraudulent procurement of the '973 patent by withholding the Kovács reference, as discussed previously, Illumina has attempted to gain monopoly power by bringing of suit based on a patent known to be not infringed and obtaining a preliminary injunction based on knowingly false statements.

228.    Through this misconduct, there is a dangerous probability that Illumina will successfully monopolize the market for NGS systems in the United States.  That conduct is harmful to competition.

229.    Illumina's conduct occurred in or affected interstate commerce.

230.    Complete Genomics was harmed in its business or property because of Illumina's conduct.

231.    That harm is the type that the antitrust laws were intended to prevent.

**COUNT 6:  UNFAIR COMPETITION (CAL. BUS. & PROF. CODE § 17200) RELATING TO U.S. PATENT NO. 7,771,973**

232.    Plaintiffs hereby re-allege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

233.    With respect to the fraudulent procurement of the '973 patent by withholding the Kovács reference, as discussed previously, Illumina's conduct alleged above to violate Section 2 of the Sherman Act is unlawful.

234.    Illumina's conduct also is unfair because it threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of law, or otherwise significantly threatens or harms competition.

235.    Complete Genomics was harmed in its business or property because of Illumina's conduct.

**COUNT 7:  MONOPOLIZATION (15 U.S.C. § 2) RELATING TO U.S. PATENT NO. 10,480,025**

236.    Plaintiffs hereby re-allege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

237.    Sales of NGS in the United States is a relevant antitrust market.

238.    Illumina has monopoly power in that market.

239.    With respect to the alleged infringement of the '025 patent by CoolMPS, it is objectively and subjectively baseless and constitutes sham litigation, which is afforded no antitrust immunity.  Illumina has maintained monopoly power by bringing of suit based on a patent known to be not infringed and obtaining a preliminary injunction based on knowingly false statements.

240.    That conduct is harmful to competition.

241.    Illumina's conduct occurred in or affected interstate commerce.

242.    Plaintiffs were harmed in their business or property because of Illumina's conduct.

243.    That harm is the type that the antitrust laws were intended to prevent.

**COUNT 8:  ATTEMPTED MONOPOLIZATION (15 U.S.C. § 2) RELATING TO U.S. PATENT NO. 10,480,025**

244.    Plaintiffs hereby re-allege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

245.    Sales of NGS in the United States is a relevant antitrust market.

246.    With respect to the alleged infringement of the '025 patent by CoolMPS, it is objectively and subjectively baseless and constitutes sham litigation, which is afforded no antitrust immunity.  Illumina has attempted to gain monopoly power by bringing of suit based on a patent known to be not infringed and obtaining a preliminary injunction based on knowingly false statements.

247.    Through this misconduct, there is a dangerous probability that Illumina will successfully monopolize the market for NGS systems in the United States.

248.    That conduct is harmful to competition.

249.   Illumina's conduct occurred in or affected interstate commerce.

250.   Complete Genomics was harmed in its business or property because of Illumina's conduct.

251.   That harm is the type that the antitrust laws were intended to prevent.

**COUNT 9:  UNFAIR COMPETITION (CAL. BUS. & PROF. CODE § 17200) RELATING TO U.S. PATENT NO. 10,480,025**

252.   Plaintiffs hereby re-allege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

253.   With respect to the alleged infringement of the '025 patent by CoolMPS, it is objectively and subjectively baseless and constitutes sham litigation, which is afforded no antitrust immunity.  Illumina's conduct alleged above to violate Section 2 of the Sherman Act is unlawful.

254.   Illumina's conduct also is unfair because it threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of law, or otherwise significantly threatens or harms competition.

255.   Complete Genomics was harmed in its business or property because of Illumina's conduct.

**DEMAND FOR JURY TRIAL**

256.   Plaintiffs hereby demand a jury trial on all its claims.

**PRAYER FOR RELIEF**

257.   Plaintiffs respectfully pray for the following relief:

a.   a judgment finding that Illumina violated Section 2 of the Sherman Act and California Business and Professions Code § 17200;

b.   a preliminary injunction to prevent further irreparable harm to the consuming public and Plaintiffs, prohibiting Illumina from maintaining a preliminary injunction that prevents Plaintiffs from introducing the CoolMPS product in the United States;

c.   a permanent injunction prohibiting Illumina from maintaining its patent lawsuits against Complete Genomics' CoolMPS products;

1          d.      a judgment and order requiring Illumina to pay Complete Genomics' damages

2                  in an amount adequate to compensate it for Illumina's violations of the

3                  Sherman Act;

4          e.      treble damages, costs, and attorneys' fees, pursuant to 15 U.S.C. § 15;

5          f.      restitution;

6          g.      a judgment and order requiring Illumina to pay pre-judgment interest and post-

7                  judgment interest to the full extent allowed under the law; and

8          h.      any further relief the Court may deem just and proper.

9

10   DATED:  January 11, 2021                    Respectfully submitted,

11                                               QUINN EMANUEL URQUHART &
                                                 SULLIVAN, LLP
12

13

14                                          By _____/s/ David Bilsker_____
                                               David Bilsker (Bar No. 152383)
15                                             50 California Street, 22nd Floor
                                               San Francisco, CA  94111
16                                             (415) 875-6600 Tel.
                                               (415) 875-6700 Fax
17                                             davidbilsker@quinnemanuel.com

18                                             Attorneys for Plaintiffs Complete Genomics, Inc.,
                                               BGI Americas Corp., and MGI Americas, Inc.
19

20

21

22

23

24

25

26

27

28